[No. B213866. Second Dist., Div. One. June 25, 2010.]

ARNOLD GREENSPAN, as Trustee, etc., Plaintiff and Respondent, v. LADT, LLC, et al., Defendants and Appellants.

1414

**Counsel**

Leonard, Dicker & Schreiber, James P. Schreiber, Richard C. Leonard and Steven A. Schuman for Defendants and Appellants.

Bingham McCutchen, Daniel Alberstone, Peter F. Smith, Rena L. Scott; Greines, Martin, Stein & Richland, Robin Meadow and Jeffrey E. Raskin for Plaintiff and Respondent.

**Opinion**

**MALLANO, P. J.**—A trust filed this action alleging breach of contract and other claims against two affiliated companies, only one of which was a party to the contract. The trust also named as a defendant the individual who controlled the companies. Defendants petitioned the trial court to compel arbitration of the claims. The trial court granted the petition.

The parties selected an arbitrator associated with JAMS. Previously, some of the parties, including the trust and the individual defendant, had chosen JAMS and the same arbitrator to hear a separate dispute. Before the arbitrator heard this case, he rendered an award in the other matter, finding the individual defendant liable to the trust. The individual responded by filing a civil suit against the arbitrator, alleging the award was untimely.

Thereafter, in this case, defendants requested that the arbitrator recuse himself in light of the civil suit. The arbitrator declined. JAMS also denied the request, providing a written explanation. Defendants sought relief in the trial court without success.

The arbitration hearing went forward. After the presentation of evidence, the parties submitted briefs. Twenty-eight days later, the arbitrator rendered an interim award, finding in favor of the trust on the contract claim and awarding approximately $6.34 million against the company that was a party to the contract. Defendants otherwise prevailed. The interim award also reserved certain issues for resolution in the final award, including attorney fees and the liability, if any, of the noncontracting company. As to those issues, the arbitrator requested additional briefs and declarations, and established a timetable for the remaining proceedings. In the final award, which

reiterated the terms of the interim award, the arbitrator awarded attorney fees to the trust and concluded that the two companies should be jointly and severally liable for breach of contract.

The trust returned to the trial court and filed a petition to confirm the award. The companies petitioned to vacate it. The trial court confirmed the award and entered judgment accordingly.

On appeal, the companies argue the award should be vacated because (1) the trust did not plead joint and several liability on the breach of contract claim and thus the issue was not arbitrable; (2) the arbitrator's finding of joint and several liability was not rationally related to the parties' contract; (3) the final award was not timely under JAMS rules; and (4) the arbitrator should have been disqualified based on the civil suit brought against him by the individual defendant.

We affirm for several reasons. First, as provided by JAMS rules, the arbitrator, not a court, determines what issues are arbitrable, and consequently we defer to the arbitrator's determination that the issue of joint and several liability was arbitrable. Second, the arbitrator's finding of joint and several liability was rationally related to the parties' contract. Third, as to the timeliness of the final award under JAMS rules, the arbitrator's interpretation and application of the rules cannot be judicially reviewed on the merits. Last, although we do not defer to the arbitrator or JAMS on the merits of the disqualification issue, we independently conclude the suit against the arbitrator was barred by arbitral immunity and would not have caused a reasonable person to doubt the arbitrator's impartiality.

# I

## BACKGROUND

The allegations and facts in this case are taken from the complaint, the petition to compel arbitration, and the respective petitions to confirm and vacate the arbitration award.

### A. *Parties' Contract*

In 1998, LADT, LLC (LADT), purchased the Higgins Building in downtown Los Angeles. LADT converted the dilapidated structure, built in 1910, from an office building into apartments. In 2003, Barry Shy, who managed LADT, proposed to convert the Higgins Building into loft-style residential condominiums, with commercial units on the ground floor. At the time, Shy held a 50 percent interest in LADT through a company he controlled,

LABAR, LLC. The Andrew Meieran Family Trust held the other 50 percent. Arnold Greenspan was the trustee of the trust. (For convenience, we refer to the Andrew Meieran Family Trust as Trust, to Andrew Meieran as Meieran, and to Arnold Greenspan as Greenspan.)

The Trust's goal was to develop and operate historic bars, not just real estate. For that reason, the Trust decided to sell its interest in LADT and to acquire commercial space on the ground floor of the Higgins Building, where it would later build the Edison Bar.

On August 20, 2004, the Trust sold its 50 percent interest in LADT to a new company controlled by Shy—LA ABC, LLC (LA ABC)—for $7.75 million, payable in two installments, and title to six commercial units in the Higgins Building valued at $3.5 million altogether. The "Purchase Agreement" recited that it was "entered into . . . by and between Arnold Greenspan, Trustee of the Andrew Meieran Family Trust u/a/d 12/19/03 . . . (the 'Seller'), and LA ABC, a California limited liability company (the 'Purchaser')."

Section 6 of the Purchase Agreement addressed the duties of LADT, stating: "LADT hereby consents to the terms of this Agreement, including, without limitation, the provisions of . . . Section 4. LADT shall cooperate with the parties hereto and take all actions and execute any agreements and other documents necessary to effectuate the transactions contemplated by this Agreement, including, without limitation, the transactions set forth in . . . Section 4, as necessary. In addition, Barry Shy, individually, agrees to guarantee all the obligations of Purchaser pursuant to Section 4 hereof, and Andrew Meieran, individually, agrees to guarantee all of the obligations of Seller hereunder." Section 4 stated that LA ABC would indemnify the Trust for any breach of the Purchase Agreement by LA ABC and that the Trust would indemnify LA ABC with respect to any breach by the Trust.

The Purchase Agreement was signed by Greenspan as trustee of the "Seller"—the Trust—and by Shy as manager of the "Purchaser"—LA ABC. For its part, LADT "acknowledged and agreed . . . to Section 6" of the Purchase Agreement, with Shy signing twice, first as manager of LADT and then individually; Meieran signed as a member of LADT. The Purchase Agreement did not have an arbitration provision. It contained an integration clause stating: "This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, both written and oral, among such parties with respect to such subject matter. This Agreement may not be amended or modified in any way, except by a written instrument executed by all of the parties hereto."

On February 17, 2005, LA ABC transferred six commercial units to the Trust. During the construction phase of the project, Shy and Meieran had a number of disagreements. They argued about walls that had been moved, trash areas, parking spaces, and storage spaces. LA ABC failed to make the second of the two installment payments due under the Purchase Agreement.

## B. *Mediation*

In an attempt to settle their disputes, Shy and Meieran participated in a mediation on September 26, 2005. The mediation resulted in a handwritten document drafted by the mediator, which Shy and Meieran signed. The document contained a list of 10 items to be provided or completed by LA ABC, including "[p]ay for 50% to upgrade electrical power," "3 parking spaces for free for 5 years," and "[f]inish existing bathroom in unit 107." The document concluded: "This is the agreement between the parties with regard to the purchase of LADT by LA ABC [from] Andrew Meieran Living Trust . . . . The parties hereby agree that LA ABC will do or perform or pay these items in exchange for release from the Trust with respect to this purchase (. . . the Higgins Building), and as full satisfaction of the obligation of LA ABC with regard to the tenant improvements. [¶] Any dispute as to the interpretation of this agreement shall be submitted to mediation, failing which, shall be submitted to binding arbitration." (For clarity, we will refer to the handwritten document as the Arbitration Agreement.)

## C. *Complaint*

On August 10, 2006, Greenspan, as trustee of the Trust, filed this action against LADT, LA ABC, and Shy. The complaint alleged as follows.

LA ABC failed to pay more than $4.2 million of the purchase price for the Trust's interest in LADT. LA ABC did not obtain the certificate of occupancy required by the Purchase Agreement, preventing the Trust from using the commercial units in the Higgins Building. LA ABC also interfered with the Trust's use of parking spaces and storage space in the building.

The complaint asserted seven causes of action: (1) rescission of the Purchase Agreement, against LA ABC and LADT; (2) breach of the Purchase Agreement, against LA ABC; (3) breach of guaranty, against Shy; (4) breach of fiduciary duty, against Shy; (5) accounting, against all defendants; (6) conversion, against all defendants; and (7) constructive trust, against all defendants.

Under the heading, "Parties Involved," the complaint recited: "Plaintiff is informed and believes, and based thereon alleges, that all of the acts set forth

in this Complaint alleged to have been done by each defendant were authorized, approved, or ratified by each of the other defendants. Plaintiff is informed and believes and thereon alleges that each of the defendants is the *agent*, servant, employee, partner, associate, joint venturer, co-participant *and/or principal* of the remaining defendants." (Italics added.)

D. *Petition to Compel Arbitration*

On September 22, 2006, defendants filed a petition to compel arbitration and stay the action pending the outcome of arbitration. According to the petition, the Arbitration Agreement required the parties to arbitrate disputes related to the Purchase Agreement. The Trust filed opposition papers, contending it was not a party to any agreement containing an arbitration clause, and the Arbitration Agreement did not encompass the causes of action in the complaint. At a hearing on October 11, 2006, each side claimed the other had drafted the Arbitration Agreement. The hearing was continued so the parties could retain a document examiner to determine who wrote the agreement. On November 8, 2006, the parties filed a stipulation, agreeing that the mediator was the author. The hearing resumed and concluded on December 11, 2006. The trial court, Judge Robert L. Hess presiding, took the matter under submission.

By order dated January 11, 2007, the trial court found "the parties have entered into a valid agreement to submit disputes regarding the Higgins Building initially to mediation and thereafter to binding arbitration. [¶] . . . Plaintiff is to initiate mediation, and defendants are to cooperate in that initiation. Should mediation be unsuccessful, the parties are to attempt to agree upon an arbitrator. If the parties are unable to agree, the Court on application will select an arbitrator."

E. *Resolution of a Separate Dispute*

The Trust was also in the midst of a dispute concerning a different real estate project with Shy and one of his other companies, Manhattan Loft, LLC (Manhattan Loft). That project was nicknamed the "215 Building" because of its location, 215 West Sixth Street, Los Angeles. The Trust accused Manhattan Loft and Shy of breaching the purchase contract for the 215 Building by interfering with the Trust's use of leased space. Pursuant to an arbitration clause in the purchase contract, the Trust, Manhattan Loft, and Shy selected retired Judge Keith Wisot as the arbitrator, in association with JAMS. The arbitration hearing started on June 11, 2007, and continued intermittently until July 2, 2007. Posthearing briefs were submitted.

On October 4, 2007, the arbitrator rendered an interim award in the 215 Building arbitration, finding in favor of the Trust and awarding it approximately $13.5 million in damages against Manhattan Loft and Shy. After

additional briefing, the arbitrator rendered a final award on November 5, 2007, granting the Trust's request for almost $1 million in attorney fees and costs. Manhattan Loft and Shy sought to vacate the award, while the Trust sought to confirm it (*Greenspan v. Manhattan Loft, LLC* (Super. Ct. L.A. County, 2008, No. BS111465)). In seeking to set aside the award, Manhattan Loft and Shy argued the arbitrator had decided claims not submitted to arbitration, granted relief not rationally related to the contract, and failed to issue the final award in a timely manner. The superior court, Judge Richard L. Fruin presiding, modified the award by excising over $12 million and confirmed the award as modified. Both sides appealed.

On October 16, 2007, shortly after the *interim* award had been issued in the 215 Building arbitration, Shy filed a civil suit against the arbitrator, alleging the arbitrator had violated JAMS rules by not issuing a timely *final* award (*Shy v. Wisot* (Super. Ct. L.A. County, 2010, No. BC379171).) The complaint sought the return of the arbitral fees and costs Shy paid in connection with the 215 Building arbitration.

The suit against the arbitrator was stayed pending the appeal of Judge Fruin's order modifying and confirming the award in the 215 Building case. On appeal, Division Three of this district rejected all of the challenges to the award and held that Judge Fruin had erred by modifying it (*Greenspan v. Manhattan Loft, LLC* (Nov. 10, 2009, B205917) [nonpub. opn.]). Division Three reversed and remanded with directions to confirm the award as rendered.

In light of Division Three's decision, which concluded that the arbitration award was timely, there were no grounds for the suit against the arbitrator. Shy dismissed the case with prejudice.

F. *Arbitration in This Action*

Meanwhile, after Judge Hess issued the January 11, 2007 order granting the petition to compel arbitration in this action, the parties failed to resolve their disputes through mediation and proceeded with selecting an arbitrator. They, too, chose retired Judge Keith Wisot, in association with JAMS.

Preliminary proceedings in the arbitration, including conferences and motion hearings, began in March 2007 and continued for several months. At an initial status conference on March 7, 2007, the parties agreed that the arbitration would be governed by "JAMS Comprehensive Arbitration Rules & Procedures." Those rules became effective on March 26, 2007 (JAMS Rules

or Rules).[1] The Trust subsequently moved to amend the complaint to add a cause of action for fraud. The arbitrator granted the motion.

In March 2007, the parties executed an "Agreement[] Concerning Hold Instructions," which required the arbitrator to decide how to dispose of certain funds belonging to LADT. The funds were generated by LADT's sale of two condominiums in the Higgins Building. At some point, the Trust had recorded a lis pendens against those units, preventing the closing of escrow. The Trust eventually removed the lis pendens, allowing the units to be sold, in exchange for LADT's promise to hold the sales proceeds for disposition by the arbitrator. The agreement concerning hold instructions (Hold Funds Agreement) stated: "Whereas, on or about March 9, 2007, Arnold Greenspan, as Trustee of the Andrew Meieran Family Trust, and Barry Shy, as managing member of LADT LLC, executed Hold Instructions for the seller's net proceeds concerning Units 906 and 1001 of the Higgins Building in order to allow the sales of these Units to be closed.

"The Undersigned hereby agree that they will execute Mutual Instructions ('Instructions'), on or before April 30, 2007, to Mara Escrow. These Instructions will provide that Mara Escrow will transfer the monies held in its interest bearing account, pursuant to the Hold Instructions, to a joint blocked account designated by the undersigned parties. Said account will be opened by the undersigned parties in an institution that is FDIC insured. The account will be [a] blocked account and the institution will receive instructions that the funds may only be released to a person or entity designated by Judge Wisot in his final award in [the Higgins Building arbitration].

"The parties hereby waive any right to challenge, in court or otherwise, any order to release these funds as set forth in Judge Wisot's final award."

The Hold Funds Agreement was signed by Shy as manager of LADT and by Greenspan as trustee of the Trust.

As noted, before the arbitration hearing commenced in this action, the arbitrator issued the interim award in the 215 Building arbitration. He found Manhattan Loft and Shy jointly and severally liable to the Trust in the amount of $13,550,522. Within two weeks of the award, Shy filed a civil suit against the arbitrator (*Shy v. Wisot, supra*, No. BC379171).

In the present action, defendants requested that the arbitrator recuse himself in light of the civil suit. The arbitrator declined, finding defendants

---

[1] The Rules were in effect from March 26, 2007, to July 15, 2009, when the *current* rules became operative. The rules in effect *before* March 26, 2007, covered the period February 19, 2005, to March 26, 2007. All of these versions may be found online at <http://www.jamsadr.com/rulesclauses/xpqGC.aspx?xpST=RulesClauses> (as of June 25, 2010).

had not shown good cause for disqualification. On December 13, 2007, JAMS issued a written denial of the request, stating: "Your request that Judge Wisot disqualify himself from serving as an arbitrator in *Greenspan v. LADT* . . . has been referred by Judge Wisot to the [JAMS National Arbitration Committee (NAC)] for resolution in accordance with the JAMS Rules.

"As explained below, the NAC denies the request.

"You assert Judge Wisot should be disqualified in *Greenspan v. LADT* because he made credibility findings regarding Mr. Shy in *Greenspan v. Manhattan Loft* . . . ; because the claimant in [the] *Greenspan v. Manhattan Loft* matter has moved to confirm the final award issued; and because you have filed a lawsuit against Judge Wisot and JAMS in which you assert Judge Wisot lost jurisdiction to issue a timely award in *Greenspan v. Manhattan Loft*. These assertions do not provide good cause for disqualifying Judge Wisot.

"Manhattan Loft and Mr. Shy agreed Judge Wisot would serve as arbitrator in both *Greenspan v. Manhattan Loft* [(the 215 Building case)] and *Greenspan v. LADT* [(the Higgins Building case)]. Your clients further requested that Judge Wisot arbitrate these two related matters separately. By so doing, your clients accepted the possibility that Judge Wisot would issue an award in one matter before doing so in the other. Obviously, your clients also accepted the possibility that Judge Wisot would determine issues of fact and law against them. Thus, the fact that Judge Wisot made findings of fact adverse to your client in *Greenspan v. Manhattan Loft* does not call for his disqualification in *Greenspan v. LADT.*

"Similarly, the Petition to Confirm Judge Wisot's Final Award in *Greenspan v. Manhattan Loft* now pending in Los Angeles Superior Court does not require the disqualification of Judge Wisot in *Greenspan v. LADT.* The process being followed by Greenspan is required pursuant to [Code of Civil Procedure section] 1285 et seq.

"Finally, your clients' lawsuit against JAMS and Judge Wisot, which has been stayed temporarily, and may be stayed and/or abated pending the resolution of the Petition to Confirm, provides no basis for disqualification. The fact that a losing party in an arbitration has sued does not in and of itself serve as grounds for recusal of the arbitrator in another arbitration pending before the arbitrator. Bringing the lawsuit is a voluntary act by the losing party, and should not be permitted to serve as a mechanism for influencing or controlling proceedings in other ongoing matters.

"Accordingly, your clients' request that Judge Wisot be disqualified in *Greenspan v. LADT* is denied. Judge Wisot is . . . to proceed with the pending arbitration."

On December 21, 2007, defendants filed a motion in the trial court seeking to have the arbitrator disqualified because of Shy's civil suit. The motion was heard and denied on January 23, 2008. At the hearing, Judge Hess directed some of his comments to defendants' counsel, stating: "This is a situation where you have agreed that the same arbitrator is going . . . to hear both these disputes.

"The first one turned out adversely to you, and now you are objecting to the arbitrator. . . . The fact that you may think that the arbitrator is biased against you because he found against you on the merits in the other case, and therefore should be recused . . .—this is a little bit of a hard sell. [¶] . . . [¶]

"There was no basis for challenging him as far as I can see, prior to the initiation of the arbitration and prior to his beginning to hold evidentiary proceedings in this [case].

". . . You have to get the award, whatever the award is, and then we will see where we are. . . . I have a dim view of people who try and disqualify arbitrators by suing.

"You are trying to create the basis for disqualification where none exists. . . . [T]he impression that I have here, is that you are trying by hook or by crook, to shortcut this, and you don't like the results, and so it doesn't matter what you try and do. [You] are pulling out all the stops [by] whatever means.

". . . [I]t doesn't engender a lot of sympathy. I have no personal stake in the outcome of this case. I don't care who wins or who loses, but we need to proceed in a regular fashion . . . , according to law and I just have a real bad reaction to this. . . .

". . . [A]t the end of it, you may have a basis for a motion to vacate an award, that is, assuming you lose, but I don't see it here."

The arbitration hearing began on February 25, 2008, resumed on March 3, 2008, and continued until it concluded on March 14, 2008. The parties submitted posthearing briefs.

In its opening posthearing brief, the Trust focused almost exclusively on the first cause of action, for rescission of the Purchase Agreement. The Trust

argued that "because the Arbitrator can adjust the equities of the parties and grant relief that will achieve substantial justice for the injured party, all [of the defendants] should be held <u>jointly and severally</u> liable for payment of the funds to which the Trust is entitled. . . . '[A] joint and several judgment against all defendants would force the defendants other than [the purchaser] to assure payment of this monetary portion of the judgment in the event [the purchaser] fails to pay it. Otherwise, plaintiffs would not be made whole.' . . . To ensure that the Trust is properly made whole . . . , the Arbitrator should find all three [defendants] jointly and severally liable." (Quoting *Snelson v. Ondulando Highlands Corp.* (1970) 5 Cal.App.3d 243, 258 [84 Cal.Rptr. 800].)

In their posthearing brief, defendants discussed the Hold Funds Agreement, saying: "The Arbitrator must . . . decide who owns the proceeds of the sale of units 906 and 1008. [The Trust] placed a lis pendens on those units, and the parties agreed to lift the lis pendens and allow the Arbitrator to determine whether [the Trust] actually had a right to title to those units or the proceeds. [The Trust] does not even bother to claim [it] has a legal right to the proceeds, i.e., that [it] owned the units. Instead, [it] argues that [it] is entitled to a money judgment against LADT and that the Arbitrator should, in effect, grant a pre-judgment writ of attachment on LADT's money. Of course, [the Trust] cites no authority for such relief. Even if LADT were liable for anything, which it is not, LADT is not a party to the contract."

In its reply posthearing brief, the Trust asserted: "Because [defendants] are jointly and severally liable for the return of all consideration paid . . . , the Trust is entitled to receive the funds being held in escrow to help restore the Trust to its former position as far as possible. *Runyan v. Pac. Air Indus. Inc.* 2 Cal.3d 304, 316 [85 Cal.Rptr. 138, 466 P.2d 682] (1970). The parties voluntarily agreed that disposition of the funds held in escrow would be decided by the Arbitrator. . . . The Arbitrator is not, as [defendants] suggest, being asked to grant a pre-judgment writ of attachment, but rather simply to exercise his broad discretion to fashion relief that adjusts the equities of the parties."

G. *Interim and Final Awards*

On June 13, 2008, the arbitrator rendered an "Interim Award," consisting of 26 pages. The award indicated that the arbitration hearing had been closed, stating: "With [the Trust's] Reply [Brief] dated May 16, 2008, the matter was submitted." On the merits of the Trust's claims, the arbitrator found LA ABC was liable on the second cause of action, for breach of contract, and awarded the Trust $6,338,566.89 in damages. The Trust otherwise failed to prove its claims. With respect to the issues raised by the Hold Funds Agreement, the

arbitrator stated: "The funds in escrow (including any interest earned) are . . . the property of LADT, for distribution under its current operating agreement. However, in an exercise of equitable discretion in fashioning this Award, the arbitrator now directs the funds are to remain in escrow until the award . . . is fully satisfied."

The Interim Award concluded: "This Award disposes of all substantive issues raised in this arbitration. [The Trust] is the prevailing party, and entitled . . . to recover attorney fees and costs . . . . [¶] This is an Interim Award, however, because the arbitrator retains jurisdiction in several particulars: [¶] . . . [¶] [(1)] to include within the award attorney fees and costs, including JAMS fees; [¶] [(2)] to reopen the hearing, if requested by [the Trust] . . . ; [¶] [(3)] to consider *modification of the Disposition of Funds Held in Escrow, or equitable remedies*, if any, available *against [defendants] other than LA ABC for satisfaction of the award*[.] . . . [¶] The parties are *directed to submit briefs and declarations* on the matters reserved for further consideration pursuant to the [established] schedule[.] [¶] . . . [¶] Unless the arbitrator determines to reopen the hearing, or to schedule further argument based on the submissions, the Final Award will issue no later than August 1, 2008." (Italics added.) On June 16, 2008, JAMS served the Interim Award on the parties.

In a letter to the arbitrator dated June 18, 2008, defendants stated: "We are willing to treat the Interim Award as a timely *final* ruling on the substance, allowing you to rule on attorneys' fees and costs . . . . To the extent that you treat the Interim Award as truly interim, and seek to re-open the hearing or . . . grant additional substantive relief, [defendants] hereby object to your continued participation . . . ." (Italics added.)

On June 30, 2008, the Trust submitted a "Request to Reopen Hearing." The Trust argued that, under section 6 of the Purchase Agreement, LADT was jointly and severally liable for payments owed by LA ABC, including all damages. (See pt. IA., *ante*, quoting Purchase Agreement, § 6.) The Trust also relied on the Hold Funds Agreement: "Since LA ABC's only asset was its interest in LADT, it had no funds to make the payments to the Trust. . . . [¶] . . . [¶] . . . [T]he Trust will be forced to pursue LADT to recover the balance owed under the final award. No purpose would be served by having the funds remain in escrow. To the contrary, it is only fair and just that the Arbitrator include in the final award an express order that the funds be released to the Trust as partial satisfaction of the award."

By letter dated June 30, 2008, defendants informed the arbitrator: "We have received . . . the motion to re-open. [¶] We hereby unconditionally object to your jurisdiction . . . . [¶] . . . [¶] Either your Interim Award counts

as a Partial Final Award, or it does not. If it does, then you have no right to re-open . . . , and your jurisdiction is limited to awarding attorneys' fees, costs and pre-award interest. If it does [not], then you have . . . exceeded the deadline to issue a Partial Final or Final Award, and you lack jurisdiction to do anything at all. [¶] We will not participate further in any proceedings related to the merits in this arbitration. We will limit ourselves to those issues over which you do have jurisdiction." (Fn. omitted.)

On July 14, 2008, defendants submitted a brief in opposition to the Request to Reopen Hearing, renewing their jurisdictional objection: "The Interim Award already exceeds the Arbitrator's jurisdiction in several regards, and [the Trust] has now asked the Arbitrator to further exceed his jurisdiction by granting a motion for reconsideration under the guise of a phony 're-opening' of the hearing. The Arbitrator cannot re-open the hearing after issuing an award. Moreover, [the Trust] is not really asking for a re-opened hearing, i.e., the calling of new witnesses and the submission of additional evidence. Rather, [the Trust] is simply *rearguing* the same issues [it] litigated and lost . . . . [¶] . . . [¶]

". . . [The Trust] is not interested in re-opening the hearing. A hearing means live testimony, with the right to cross-examination. [The Trust] does not ask for a new hearing, nor does [the Trust] offer any *new or different evidence*. A re-opened hearing would require an actual hearing, *which no one wants* and which certainly is not anticipated by the Interim Award *nor justified for any reason*. Reconsideration of the Arbitrator's decisions to date, based on legal arguments in briefs, is not a 'hearing.' " (Fn. omitted, italics added.)

Defendants also addressed the issue of LADT's joint and several liability on the merits. They asserted that such liability would not be rationally derived from the Purchase Agreement, citing *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 383 [36 Cal.Rptr.2d 581, 885 P.2d 994], and "[that the Trust] has no grounds to 'pursue' LADT for LA ABC's debts. Under no circumstances can LADT be held liable for LA ABC's obligations. . . . [The Trust] argue[s] that no point would be served in LADT being allowed to keep its own money. The points that would be served include complying with the Purchase Agreement, the laws of California and the Due Process clause of the United States Constitution."

In a reply brief submitted on July 25, 2008, the Trust emphasized that the arbitrator could grant any remedy or relief that was just and equitable: "Under California law, an arbitrator enjoys the authority to fashion relief that he considers just and fair so long as the remedy may be 'rationally derived' from the contract and the breach. [*Advanced Micro Devices, Inc. v. Intel Corp.*,

*supra*, 9 Cal.4th at page] 383. Here, both of the rulings that the Trust seeks are 'rationally derived' from the parties' agreements. The Purchase Agreement—which LADT executed—required LADT to 'take all actions . . . necessary to effectuate the transactions contemplated by [the] Agreement . . . .' . . . LADT thus had the contractual duty to make the payments due under the Purchase Agreement in the event that LA ABC failed to do so. Therefore, the remedy of holding LADT jointly and severally liable for payments is rationally derived from the Purchase Agreement itself. Likewise, an order directing the disbursement of funds held in escrow to the Trust as partial satisfaction of the award is rationally derived from both the Purchase Agreement and the [Hold Funds Agreement]. This latter agreement expressly states that the funds in escrow will be disbursed to a person or entity designated by the Arbitrator in his Final Award . . . . Under California law, . . . the Arbitrator has authority to find LA ABC and LADT jointly and severally liable, and to direct that the funds in escrow be distributed to the Trust."

On August 1, 2008, the arbitrator rendered a "Final Award," totaling 34 pages. The Final Award reiterated the terms of the Interim Award virtually verbatim and went on to say: "[The Trust] has demonstrated by a preponderance of evidence its entitlement to an award for breach of contract against LA ABC. In [the Trust's] request to reopen the hearing, [the Trust] reviews evidence previously presented as the basis for rendering a final award on this cause of action jointly and severally against LA ABC and LADT. As [the Trust] points out, section 6 of the Purchase Agreement sets forth the specific consent of LADT to all terms of the Agreement, and further mandates LADT to 'cooperate with the parties hereto and take all actions and execute any agreements and other documents necessary to effectuate the transactions contemplated by this Agreement. . . .' In fact, the evidence demonstrates that payments on the Purchase Agreement were made by LADT. . . . LADT by Shy, was a signator[y] to acknowledge its obligations under section 6 [of] the Purchase Agreement. . . .

"Both sides rely on *Advanced Micro Devices, Inc. v. Intel Corp.*[, *supra*,] 9 Cal.4th 362 in arguing whether the award should include LADT and find joint and several liability with LA ABC. Under that case, the arbitrator is authorized, when circumstances warrant, to fix a remedy for breach of contract that is flexible, creative, and based on fairness. 'In private arbitrations, the parties have bargained for the relatively free exercise of those faculties. Arbitrators, unless specifically restricted by the agreement to follow legal rules, may base their decision upon broad principles of justice and equity. . . .' . . . *Id.* at 374–375.

"The agreement between the parties to this arbitration contains no restriction to 'dry law,' or legal rules. In the circumstances here, LA ABC has only

one asset: its membership in LADT. It is apparently without resources to pay the award for breach of contract. Further, the evidence is clear that Shy has exclusive control over each of his entities, and that he pays little attention to which account is used to make payments on the Purchase Agreement. . . . [T]he arbitrator finds that LADT had a full opportunity and did in fact present its evidence in connection with payments on the Purchase Agreement. [Defendants'] arguments that joint and several liability violate[s] due process rights of another Shy entity, LABAR, or LADT's creditors, [are] rejected. Under the circumstances here, the arbitrator finds the remedy sought by [the Trust] is rationally derived from the Purchase Agreement and its breach. Joint and several liability with LA ABC simply implements LADT's obligation to effectuate the transactions of the Purchase Agreement."

Regarding the Hold Funds Agreement, the arbitrator found "[t]he parties stipulated the arbitrator is to determine disposition of the proceeds of sale from two units sold, where the proceeds have been held in escrow pending this arbitration. . . . No criteria were presented to guide the arbitrator's determination, but only that the funds are to be released to the person or entity designated by the arbitrator in the final award. Further, [the Trust] quotes a letter agreement that the parties 'waive any right to challenge, in court or otherwise, any order to release these funds as set forth in Judge Wisot's final award.' . . . [The Trust's] request for enforcement of that agreement was deferred until the final award. [¶] [The Trust] has not been successful in obtaining rescission of the Purchase Agreement. The funds in escrow (including any interest earned) are . . . the property of LADT. However, in an exercise of equitable discretion in fashioning this Award, and because this award sets forth joint and several liability of LADT and LA ABC, the arbitrator now directs: [¶] (1) On [the Trust's] written notice to escrow, to LADT and LA ABC, that the funds will apply in partial discharge of this award, escrow is to release the funds directly to [the Trust] within 3 business days of notice, and notwithstanding escrow instructions that may remain unfulfilled; [¶] (2) If no notice is given, escrow is to continue to hold the funds until [the Trust] gives written notice that the award has been fully satisfied. Only if the award is satisfied, escrow is then directed to release the funds directly to LADT."

With respect to reopening the hearing, the arbitrator found the Trust "does not offer any new witness or document on these issues, but seeks specific findings based on [its] review of the evidence heard in arbitration. The request to re-open the hearing is DENIED; however, the arbitrator has more fully articulated certain findings in this final award, and has otherwise clarified certain findings . . . ."

In concluding the Final Award, the arbitrator stated: "Arnold Greenspan, as Trustee of the Andrew Meieran Family Trust, is to recover from . . . LA ABC,

a California Limited Liability Company, and LADT, LLC, a California Limited Liability Company, jointly and severally: [¶] the amount of $6,534,605.66 as compensatory damages on the contract. This amount shall bear further interest at $1,298.27 per day until entry of judgment; [¶] the amount of $1,546,478 in attorney fees; [¶] the amount of $368,215.86 in costs; [¶] for a total recovery of $8,449,299.40. [¶] . . . [¶] On [the Trust's] written notice to escrow, to LADT and to LA ABC that [the Trust] will apply the escrow funds in partial discharge of this award . . . . Only after this award has been satisfied, funds in escrow are to be released directly to LADT."

### H. *Postarbitration Petitions*

On August 13, 2008, defendants petitioned the trial court to vacate the award. The Trust filed a petition to confirm. On October 16, 2008, the trial court heard argument on the cross-petitions, granted the petition to confirm, denied the petition to vacate, and entered an order to that effect. Judgment was subsequently entered. LADT and LA ABC appealed.

## II

## DISCUSSION

We review de novo the trial court's order confirming the arbitration award. (See *Advanced Micro Devices, Inc. v. Intel Corp., supra*, 9 Cal.4th at p. 376, fn. 9; *O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, 1056 [9 Cal.Rptr.3d 286].)

On appeal, LADT argues the award should be vacated because (1) the Trust did not plead joint and several liability on the breach of contract claim and thus the issue was not arbitrable; (2) the arbitrator's finding of joint and several liability was not rationally related to the parties' contract; (3) the Final Award was not timely under JAMS Rules; and (4) the arbitrator should have been disqualified based on Shy's suit against him.

We disagree with LADT's arguments because (1) as provided in JAMS Rules, the arbitrator, not a court, determines what issues are arbitrable, and we consequently defer to the arbitrator's determination that the issue of joint and several liability was arbitrable; (2) the arbitrator's finding of joint and several liability was rationally related to the parties' contract; (3) as to the timeliness of the Final Award under JAMS Rules, the arbitrator's interpretation and application of the Rules cannot be judicially reviewed on the merits; and (4) although we do not defer to the arbitrator or JAMS on the merits of the disqualification issue, we independently conclude the suit against the

arbitrator was barred by arbitral immunity and would not have caused a reasonable person to doubt the arbitrator's impartiality.

■ Under the California Arbitration Act (CAA) (Code Civ. Proc., §§ 1280–1294.2), "the [trial] court shall vacate the award if the court determines any of the following: [¶] (1) The award was procured by corruption, fraud or other undue means. [¶] (2) There was corruption in any of the arbitrators. [¶] (3) The rights of the party were substantially prejudiced by misconduct of a neutral arbitrator. [¶] (4) *The arbitrators exceeded their powers* and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted. [¶] (5) *The rights of the party were substantially prejudiced* by the refusal of the arbitrators to postpone the hearing upon sufficient cause being shown therefor or *by the refusal of the arbitrators to hear evidence material to the controversy* or by other conduct of the arbitrators contrary to the provisions of this title. [¶] (6) *An arbitrator making the award . . . was subject to disqualification upon grounds specified in Section 1281.91* but failed upon receipt of timely demand to disqualify himself or herself as required by that provision." (Code Civ. Proc., § 1286.2, subd. (a)(1)–(6), italics added; all undesignated section references are to that code.) Section 1281.91 states: "If any ground specified in Section 170.1 exists, a neutral arbitrator shall disqualify himself or herself upon the demand of any party made before the conclusion of the arbitration proceeding." (§ 1281.91, subd. (d).) Section 170.1, in turn, requires disqualification if "[a] person aware of the facts might reasonably entertain a doubt that the [arbitrator] would be able to be impartial." (§ 170.1, subd. (a)(6)(A)(iii).)

■ Arbitrators "exceed[] their powers" (§ 1286.2, subd. (a)(4)) by acting without subject matter jurisdiction, deciding an issue that was not submitted to arbitration, arbitrarily remaking the contract, upholding an illegal contract, issuing an award that violates a well-defined public policy or a statutory right, fashioning a remedy that is not rationally related to the contract, or selecting a remedy not authorized by law. (See *Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 443 [123 Cal.Rptr.2d 122]; see also *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 31–33 [10 Cal.Rptr.2d 183, 832 P.2d 899] [discussing application of § 1286.2, subd. (a)(4), to illegal contracts]; *Lindenstadt v. Staff Builders, Inc.* (1997) 55 Cal.App.4th 882, 889–893 [64 Cal.Rptr.2d 484] [same].)

A. *Arbitrable Claims*

■ "The interpretation of an arbitration provision 'is solely a judicial function unless it turns upon the credibility of extrinsic evidence; accordingly, an appellate court is not bound by a trial court's construction of a contract based solely upon the terms of the instrument without the aid of evidence.' . . . Where, as here, the language of an arbitration provision is not in

dispute, the trial court's decision as to arbitrability is subject to de novo review. . . . [¶] ' "The court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made." . . .' " (*Gravillis v. Coldwell Banker Residential Brokerage Co.* (2006) 143 Cal.App.4th 761, 771 [49 Cal.Rptr.3d 531], citations omitted.) We also interpret arbitration rules in accordance with their plain meaning. (See *Schlessinger v. Rosenfeld, Meyer & Susman* (1995) 40 Cal.App.4th 1096, 1104 [47 Cal.Rptr.2d 650]; *Cheminova A/S v. Griffin L.L.C.* (D.D.C. 2002) 182 F.Supp.2d 68, 70, 77.)

■ "[D]oubts concerning the scope of arbitrable issues are to be resolved in favor of arbitration." (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 323 [197 Cal.Rptr. 581, 673 P.2d 251]; accord, *Wagner Construction Co. v. Pacific Mechanical Corp.* (2007) 41 Cal.4th 19, 26 [58 Cal.Rptr.3d 434, 157 P.3d 1029].) But " 'there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . .' " (*Bouton v. USAA Casualty Ins. Co.* (2008) 43 Cal.4th 1190, 1199 [78 Cal.Rptr.3d 519, 186 P.3d 1]; accord, *Zavala v. Scott Brothers Dairy, Inc.* (2006) 143 Cal.App.4th 585, 590 [49 Cal.Rptr.3d 503].)

■ " '[A]n arbitrator exceeds his powers when he acts in a manner not authorized by the contract or by law.' . . . 'In determining whether an arbitrator exceeded his powers, we review the trial court's decision de novo, but we must give substantial deference to the arbitrator's own assessment of his contractual authority.' " (*O'Flaherty v. Belgum, supra,* 115 Cal.App.4th at p. 1056, citations omitted; accord, *Advanced Micro Devices, Inc. v. Intel Corp., supra,* 9 Cal.4th at pp. 372–373.)

"Our [analysis] of [LADT's] claim begins with this fundamental proposition: 'The powers of an arbitrator derive from, and are limited by, the agreement to arbitrate.' . . . Thus, in determining whether the arbitrators exceeded the scope of their powers here, we first look to the parties' agreement to see whether it placed any limitations on the arbitrators' authority.' " (*Ajida Technologies, Inc. v. Roos Instruments, Inc.* (2001) 87 Cal.App.4th 534, 543 [104 Cal.Rptr.2d 686], citation omitted; accord, *Hall v. Superior Court* (1993) 18 Cal.App.4th 427, 432 [22 Cal.Rptr.2d 376].) "In some situations, the agreement itself may not be the only source of restrictions on an arbitrator's authority. 'Even where the parties' original contract included a broad arbitration clause, the arbitrator's powers may be restricted by the limitation of issues submitted.' " (*Ajida Technologies*, at p. 543, fn. 7.) A submission agreement may restrict or broaden the issues contemplated by the arbitration clause. (See *O'Malley v. Petroleum Maintenance Co.* (1957) 48 Cal.2d 107, 110 [308 P.2d 9]; *Hall*, at p. 432; *National Indemnity Co. v.*

*Superior Court* (1972) 27 Cal.App.3d 345, 349 [103 Cal.Rptr. 606].) And the rules of a provider like JAMS may determine the scope of the arbitrator's powers. (See *Schlessinger v. Rosenfeld, Meyer & Susman, supra,* 40 Cal.App.4th at pp. 1103–1104, 1106–1107 & fn. 15; *Zakarian v. Bekov* (2002) 98 Cal.App.4th 316, 323 [119 Cal.Rptr.2d 623]; *Alan v. Superior Court* (2003) 111 Cal.App.4th 217, 224–226 [3 Cal.Rptr.3d 377]; *Cione v. Foresters Equity Services, Inc.* (1997) 58 Cal.App.4th 625, 643 [68 Cal.Rptr.2d 167].)

 "The parties may submit for decision issues they were not contractually compelled to submit to arbitration. In such event, courts look both to the contract *and* to the scope of the submissions to determine the arbitrator's authority." (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2009) ¶ 5:473.1, pp. 5-326 to 5-327 (rev. # 1, 2008); accord, *J.C. Gury Co. v. Nippon Carbide Industries (USA) Inc.* (2007) 152 Cal.App.4th 1300, 1305–1306 [62 Cal.Rptr.3d 118].) " ' " ' . . . Arbitration submissions are usually construed as broadly as possible in order that differences between the parties may be resolved quickly and economically. Under the [principle] of broad construction *an arbitrator is authorized to determine all questions which he needs to determine in order to resolve the controversy submitted to him, and the arbitrator himself decides which questions need to be determined.*' . . ." . . . "If participants in the arbitral process begin to assert all possible legal or procedural defenses in court proceedings before the arbitration itself can go forward, the arbitral wheels would very soon grind to a halt." ' " (*Kennedy, Cabot & Co. v. National Assn. of Securities Dealers, Inc.* (1996) 41 Cal.App.4th 1167, 1175 [49 Cal.Rptr.2d 66], citations omitted, italics added.)

LADT contends that, by finding it jointly and severally liable on the contract claim, the arbitrator exceeded his powers because that issue was not arbitrable under JAMS Rules. The scope of the Rules is covered by JAMS Rule 1, which states: "(a) The JAMS Comprehensive Arbitration Rules and Procedures . . . govern binding Arbitrations of disputes or claims that are administered by JAMS and in which *the Parties agree to use these Rules* or, in the absence of such agreement, *any disputed claim* or counterclaim that *exceeds $250,000,* not including interest or attorneys' fees . . . . [¶] (b) The Parties shall be deemed to have made these Rules *a part of their Arbitration agreement* . . . ." (Italics added.) Here, there is no dispute that JAMS Rules applied: The damages sought in the complaint, $4.2 million, exceeded the $250,000 minimum under JAMS Rule 1(a); the parties agreed at the March 7, 2007 status conference that JAMS Comprehensive Arbitration Rules & Procedures would govern the arbitration; and the parties contend on appeal that JAMS Rules are controlling.

LADT relies specifically on JAMS Rule 9(a), entitled "Notice of Claims," which provides: "If a matter has been submitted for Arbitration *after litigation has been commenced in court* regarding the same claim or dispute, *the pleadings in the court case, including the complaint* and answer (with affirmative defenses and counterclaims), may be filed with JAMS . . . , and if so filed, will be considered part of the record of the Arbitration. It will be assumed that the existence of such *pleadings constitutes appropriate notice to the Parties of such claims, remedies sought,* counterclaims and affirmative defenses." (Italics added.) LADT contends (1) under Rule 9(a), the complaint was the source of all arbitrable issues, (2) the complaint did not raise joint and several liability as an issue, and (3) as a result, joint and several liability was not arbitrable.

We must first decide *who* in this case determines *what* issues were arbitrable—the arbitrator or a judge. In other words, does the arbitrator or the court decide the question of arbitrability? If the arbitrator does, we should defer to that determination in the same way we defer to an arbitrator's decision on the merits, that is, the decision is not judicially reviewable for errors of fact or law unless the parties have explicitly and unambiguously agreed to an expanded scope of review. (See *Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at pp. 6, 11; *Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1355, 1361 [82 Cal.Rptr.3d 229, 190 P.3d 586].)

■ As explained in *First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938 [131 L.Ed.2d 985, 115 S.Ct. 1920]: "We believe the answer to the 'who' question . . . is fairly simple. Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute . . . , so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter. Did the parties agree to submit the arbitrability question itself to arbitration? If so, then the court's standard for reviewing the arbitrator's decision about *that* matter should not differ from the standard courts apply when they review any other matter that parties have agreed to arbitrate. . . . That is to say, the court should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances. See, *e.g.*, 9 U.S.C. § 10.[2] If, on the other hand, the parties did *not* agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently. . . . [¶] . . . [¶]

---

[2] Title 9 United States Code section 10 is part of the Federal Arbitration Act (FAA) (9 U.S.C §§ 1–16). Section 10 of the FAA (9 U.S.C. § 10) mirrors section 1286.2 of the CAA (Code Civ. Proc., § 1286.2) and permits an arbitration award to be vacated on limited grounds, such as "corruption in the arbitrator[]." (9 U.S.C. § 10(a)(2); compare 9 U.S.C. § 10(a)(1)–(4) with Code Civ. Proc., § 1286.2, subd. (a)(1)–(4).)

■ ". . . Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so. . . . In this manner the law treats silence or ambiguity about the question '*who* (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question '*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement'—for in respect to this latter question the law reverses the presumption. . . .

"But, this difference in treatment is understandable. The latter question arises when the parties have a contract that provides for arbitration of some issues. In such circumstances, the parties likely gave at least some thought to the scope of arbitration. And, given the law's permissive policies in respect to arbitration, . . . one can understand why the law would insist upon clarity before concluding that the parties did *not* want to arbitrate a related matter. . . . On the other hand, the former question—the 'who (primarily) should decide arbitrability' question—is rather arcane. A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers. . . . And, given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." (*First Options of Chicago, Inc. v. Kaplan, supra,* 514 U.S. at pp. 943–945 [115 S.Ct. at pp. 1923–1925], citations omitted.) Simply put, "[t]he question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.' " (*Howsam v. Dean Witter Reynolds, Inc.* (2002) 537 U.S. 79, 83 [154 L.Ed.2d 491, 123 S.Ct. 588, 591], italics omitted; accord, *McCarroll v. L. A. County etc. Carpenters* (1957) 49 Cal.2d 45, 65–66 [315 P.2d 322]; cf. *Rent-A-Center, West, Inc. v. Jackson* (2010) 561 U.S. ___ [177 L.Ed.2d 403, 130 S.Ct. 2772] [where arbitration provision states that arbitrator will determine "enforceability" of agreement, arbitrator, not court, decides whether entire agreement is unconscionable].)

In this case, the parties did not clearly and unmistakably agree in the Arbitration Agreement that the arbitrator would decide arbitrability; the agreement merely states: "Any dispute as to the *interpretation* of this agreement shall be submitted to . . . binding arbitration." (Italics added.) But JAMS Rule 11 is significantly broader, stating: "(a) Once appointed, *the Arbitrator* shall resolve *disputes* about the *interpretation and applicability of these Rules* and conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator shall be *final*. [¶] . . . [¶] (c) Jurisdictional and

*arbitrability disputes*, including disputes over the existence, validity, interpretation or *scope* of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on *by the Arbitrator.* The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter." (Italics added.)

In *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547 [21 Cal.Rptr.3d 322], the parties' contract stated arbitration would be conducted in accordance with the commercial arbitration rules of the American Arbitration Association (AAA). Those rules provided that the arbitrator " 'shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.' " (*Id.* at p. 550.) In discussing the issue of arbitrability, the Court of Appeal explained: "It is difficult to imagine how parties could state any more comprehensively than they did in the Contract the intent to avoid litigation at every step of the dispute resolution process. The Contract provides that if a contested claim is not settled within the contractual deadline, then it must be submitted to binding arbitration in accordance with the AAA Commercial Arbitration Rules. These rules specify that the arbitrator will decide disputes over the scope of the arbitration agreement. We conclude that the parties' agreement to arbitrate according to this rule is clear and unmistakable evidence of the intent that the arbitrator will decide whether a Contested Claim is arbitrable." (*Id.* at p. 557.)

In *Rodriguez v. American Technologies, Inc.* (2006) 136 Cal.App.4th 1110, 1123 [39 Cal.Rptr.3d 437], the Court of Appeal reached the same conclusion: "Although the scope of an arbitration clause is generally a question for judicial determination, the parties may, by clear and unmistakable agreement, elect to have the arbitrator, rather than the court, decide which grievances are arbitrable. . . . Here, the parties clearly and unmistakably agreed to have the arbitrator determine the scope of the arbitration clause. The contract mandates arbitration in accordance with the [AAA's] Construction Industry Rules. Rule 8(a) of those rules specifies the 'arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, *scope* or validity of the arbitration agreement.' (Italics added.) By incorporating rule 8(a) into their agreement, the parties clearly evidenced their intention to accord the arbitrator the authority to determine issues of arbitrability. . . . [A]ny issues concerning the scope of the arbitration clause should be determined by the arbitrator in the arbitration proceeding." (Citations omitted.)

In *Monex Deposit Co. v. Gilliam* (C.D.Cal. 2009) 616 F.Supp.2d 1023, the plaintiffs moved to compel arbitration of the defendant's counterclaims. The defendant argued that the arbitration clause was unenforceable as to his

statutory counterclaim because the arbitrator could not award meaningful relief on that claim. The court granted the motion in its entirety, noting: "The [parties'] agreement . . . incorporates JAMS Rules providing that the arbitrator decides scope and validity disputes with respect to particular claims." (*Id.* at p. 1025, citing JAMS Rule 11(a), (c).)

In *Sidell v. Structured Settlement Investments, LP* (D.Conn., Jan. 14, 2009, No. 3:08-cv-00710 (VLB)) 2009 U.S.Dist. Lexis 2244, the court granted a motion to compel arbitration and permitted the arbitrator to determine the issues to be arbitrated. The court stated: "In this case, there is both a broad arbitration clause and the incorporation by reference of the JAMS Rules. The Rules provide that arbitrators will determine their own authority. Either would suffice as evidence of the parties' intent to arbitrate arbitrability." (2009 U.S.Dist. Lexis 2244 at pp.*6–*7.)

Thus, "when . . . parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." (*Contec Corp. v. Remote Solution, Co., Ltd.* (2d Cir. 2005) 398 F.3d 205, 208; accord, *Terminix Internat. Co., LP v. Palmer Ranch Ltd. Partnership* (11th Cir. 2005) 432 F.3d 1327, 1332–1333 [citing cases]; *Qualcomm Inc. v. Nokia Corp.* (Fed.Cir. 2006) 466 F.3d 1366, 1371–1373; see also *Patchett v. Bergamot Station, Ltd.* (2006) 143 Cal.App.4th 1390, 1396–1397 & fn. 3 [49 Cal.Rptr.3d 941] [trial court properly confirmed arbitration award, notwithstanding appellant's contention that arbitrator exceeded his powers, where arbitration clause authorized arbitrator to determine " 'arbitrability of any claim' "]; cf. *Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1277, 1280–1281, 1286–1288 [73 Cal.Rptr.3d 395] [court, not arbitrator, decides whether arbitration agreement is unconscionable even if arbitration rule states that arbitrator shall decide " 'his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement' "]; *James & Jackson, LLC v. Willie Gary, LLC* (Del. 2006) 906 A.2d 76, 78, 80–81 [court, not arbitrator, decides arbitrability issue where arbitration clause incorporates AAA rules but also provides that nonbreaching party may seek injunctive relief and specific performance in court]; *Katz v. Feinberg* (2d Cir. 2002) 290 F.3d 95, 96–97 [despite incorporation of AAA rules, court, not arbitrator, decides arbitrability issue where purchase agreement contains *broadly worded* arbitration clause and *specific* clause vesting accountants with sole authority to determine purchase price].)

In the present action, JAMS Rule 11 authorized the arbitrator to make the *final* decision regarding what issues were arbitrable. Rule 11 was contained in JAMS Rules, effective March 26, 2007, and in the former rules, dating back to February 2005; it was in existence when the parties agreed to use

JAMS Comprehensive Arbitration Rules & Procedures. (See *Gilbert Street Developers, LLC v. La Quinta Homes, LLC* (2009) 174 Cal.App.4th 1185, 1192–1194 [94 Cal.Rptr.3d 918] [under "clear and unmistakable" test, AAA rules in effect at time of adoption by parties, not future rules, must state that arbitrator has authority to decide arbitrability]; see fn. 1, *ante* [discussing versions of JAMS Rules].) Here, nothing in the Arbitration Agreement or the JAMS Rules permits a court to review the arbitrator's decisions on the merits. (See *Cable Connection, Inc. v. DIRECTV, Inc., supra,* 44 Cal.4th at pp. 1355, 1361.) Accordingly, the arbitrator's determination that joint and several liability was an arbitrable issue cannot be reviewed for errors of fact or law. (See *First Options of Chicago, Inc. v. Kaplan, supra,* 514 U.S. at p. 943 [115 S.Ct. at pp. 1923–1924]; *Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at pp. 6, 11.)

The only remaining question, then, is whether the arbitrator's decision on arbitrability was "wholly groundless." (*Dream Theater, Inc. v. Dream Theater, supra,* 124 Cal.App.4th at p. 553; see *Qualcomm Inc. v. Nokia Corp., supra,* 466 F.3d at pp. 1373–1374; *McCarroll v. L. A. County etc. Carpenters, supra,* 49 Cal.2d at p. 65; *Local 205, United Elec. etc. Workers v. General Elec. Co.* (1st Cir. 1956) 233 F.2d 85, 101, affd. on another ground *sub. nom. General Electric Co. v. Local 205* (1957) 353 U.S. 547 [1 L.Ed.2d 1028, 77 S.Ct. 921].) In that regard, we examine (1) the scope of the Arbitration Agreement, JAMS Rule 11, and the parties' submissions, and (2) the precise issue the arbitrator found to be arbitrable—whether LADT was jointly and severally liable for breach of contract. (See *Qualcomm Inc.,* at p. 1374.) "Because any inquiry beyond a 'wholly groundless' test would invade the province of the arbitrator, whose arbitrability judgment the parties agreed to abide by in [the JAMS arbitration, we] need not . . . determine whether [the joint and several liability issue was] in fact arbitrable." (*Ibid.*) Given that the wholly groundless inquiry in this case does not turn on disputed facts, we address that question in the first instance.

In granting the petition to compel arbitration, the trial court found that the Arbitration Agreement permitted the arbitration of issues concerning the *interpretation* of the Purchase Agreement. JAMS Rule 11 broadened the range of arbitrable issues to include "disputes over the existence, validity, interpretation or *scope* of the [Purchase Agreement]," including "*arbitrability* disputes." (Rule 11(c), italics added.) The parties' arbitration briefs addressed whether any provision of the Purchase Agreement gave rise to joint and several liability. Thus, as authorized by the Arbitration Agreement, JAMS Rule 11, and the parties' submissions, the arbitrator interpreted section 6 of the Purchase Agreement in concluding that LADT was liable on the contract claim. Further, the Hold Funds Agreement required the arbitrator to determine whether LADT was liable to the Trust but provided no limitation on his authority in that respect, allowing him to consider any equitable theory. In

short, the arbitrator's determination of arbitrability—that the parties submitted to arbitration the issue of LADT's liability for breach of contract—was not wholly groundless.[3]

LADT counters that the arbitrator's finding of joint and several liability rested, at least in part, on alter ego principles. That may well be. (See *Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300–301 [216 Cal.Rptr. 443, 702 P.2d 601] [discussing alter ego doctrine].) Nevertheless, any dispute about alter ego liability was also arbitrable. JAMS Rule 24(c) states: "In determining the merits of the dispute the Arbitrator shall be guided by *the rules of law and equity agreed upon by the Parties*. In the *absence of such agreement*, the Arbitrator shall be guided by *the rules of law and equity that the Arbitrator deems to be most appropriate*. The Arbitrator may grant any remedy or relief that is *just and equitable* and within the scope of the Parties' agreement . . . ." (Italics added.) Neither the Purchase Agreement nor the Arbitration Agreement prescribed the rules of law or equity to be applied, leaving it to the arbitrator to choose the applicable rules.

 "The essence of the alter ego doctrine is that justice be done. 'What the formula comes down to, once shorn of verbiage about control, instrumentality, agency, and corporate entity, is that liability is imposed to reach an equitable result.' " (*Mesler v. Bragg Management Co., supra*, 39 Cal.3d at p. 301.) Consequently, the arbitrator was not constrained by any rigid rules in applying alter ego principles. And even if the Arbitration Agreement had restricted the arbitrator to California substantive law, he could have relied on the alter ego doctrine. (See *id.* at pp. 301–303 [discussing alter ego doctrine as applied to affiliated companies]; *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1249–1250 [1 Cal.Rptr.2d 301] [same].) LADT mischaracterizes this case as an attempt to hold a company liable for the debts of an *individual* shareholder. The arbitrator found LADT liable for the debts of LA ABC, a limited liability company.

LADT contends alter ego liability was never properly alleged in the complaint. But JAMS Rule 9, which governs the amendment of pleadings, vests the arbitrator not only with the task of ruling on motions to amend but also with the authority to decide whether an amendment is necessary. Here, the complaint alleged that each defendant was liable for the acts of the other defendants and that each defendant was "the *agent*, servant, employee, partner, associate, joint venturer, co-participant *and/or principal* of the remaining defendants." (Italics added.) The arbitrator could have concluded

---

[3] The record contains a JAMS "Stipulation for Arbitration" stating that the parties "submit all disputes, claims or controversies to neutral, binding arbitration at JAMS." But the stipulation's date and reference number indicate it applied to the 215 Building arbitration. We therefore do not consider it relevant to the arbitrability issue.

those allegations were sufficient to raise the issue of alter ego liability. (See *Hall v. Superior Court, supra*, 18 Cal.App.4th at pp. 430, 436–437 [allegation in complaint that defendant was "agent" of another defendant permitted arbitrator to conclude that "partnership" liability was among arbitrable issues]; *Mesler v. Bragg Management Co., supra*, 39 Cal.3d at pp. 301–303 [affiliate's liability under alter ego doctrine is analogous to "liability of a principal for acts of a general agent"].) Thus, consistent with JAMS Rule 11, we cannot review the arbitrator's determination that, without further amendment, the complaint alleged alter ego liability as to LADT.

In addition, "where a defendant is charged with liability[,] his denial thereof is sufficient to establish [his] liability upon the principle of alter ego even though the complaint is devoid of such an allegation." (*Auer v. Frank* (1964) 227 Cal.App.2d 396, 403 [38 Cal.Rptr. 684], italics omitted.) "[C]ourts have followed a liberal policy of applying the alter ego doctrine where the equities and justice of the situation appear to call for it rather than restricting it to the technical niceties depending upon pleading and procedure." (*First Western Bank & Trust Co. v. Bookasta* (1968) 267 Cal.App.2d 910, 915 [73 Cal.Rptr. 657], italics omitted.) Further, putting the complaint aside, the Hold Funds Agreement was sufficiently broad to encompass the issue of alter ego liability. And LADT should have known the issue was before the arbitrator because the Interim Award directed the parties to submit additional briefs and declarations addressing whether LADT should be liable for the debts of LA ABC. (See *Lyons v. Stevenson* (1977) 65 Cal.App.3d 595, 606–607 [135 Cal.Rptr. 457].)

Finally, we reject LADT's argument that the arbitrator did not allow it to introduce evidence on the issue of joint and several liability. LADT has not pointed to a single instance in which the arbitrator excluded or declined to consider proffered evidence. In the Interim Award, the arbitrator "retain[ed] jurisdiction" over the issue of joint and several liability and "directed" the parties to submit briefs *and declarations* on that subject. LADT responded with a letter, "unconditionally object[ing]" to the arbitrator's authority to consider the issue of joint and several liability and stating it would "not participate further in any proceedings related" to that issue. In its opposition brief, LADT continued to press its objection: "The Arbitrator *cannot re-open the hearing* after issuing an award. . . . [The Trust] is simply *rearguing* the same issues [it] litigated and lost . . . . [¶] . . . [¶] . . . [The Trust] is not interested in re-opening the hearing. A hearing means live testimony, with the right to cross-examination. [The Trust] does not ask for a new hearing, nor does [the Trust] offer any *new or different evidence*. A re-opened hearing would require an actual hearing, *which no one wants* and which certainly is not anticipated by the Interim Award *nor justified for any reason*." (Italics added, fn. omitted.) LADT took the position that, in seeking to impose joint

and several liability, the Trust was merely rearguing the same issues and that new or additional evidence was unnecessary.

Notwithstanding its objection, LADT addressed the subject of joint and several liability on the merits, arguing it could not be found liable for LA ABC's debts under section 6 of the Purchase Agreement or, for that matter, "[u]nder [any] circumstances." As LADT saw it, joint and several liability would violate "the Purchase Agreement, the laws of California and the Due Process clause of the United States Constitution." But LADT declined to offer any new or additional evidence regarding joint and several liability, failing to comply with the arbitrator's instructions to submit declarations on the issue. Thus, LADT made a strategic decision to discuss the merits of joint and several liability but not to offer any evidence.

 In sum, we defer to the arbitrator's determination as to what issues were arbitrable, and we cannot review that determination on the merits. For the reasons discussed, we also disagree with LADT's contention that its "rights . . . were substantially prejudiced . . . by the refusal of the arbitrator[] to hear evidence material to the controversy." (§ 1286.2, subd. (a)(5).) The arbitrator directed the parties to submit evidence on the issue of joint and several liability. In response, LADT objected to the arbitrator's jurisdiction to decide the issue, addressed the issue on the merits, and elected not to offer any evidence in support of its position.

Nor do we accept LADT's overly narrow interpretation of JAMS Rule 11. LADT focuses on the last sentence of Rule 11(c), which states: "The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a *preliminary matter*." (Italics added.) LADT interprets the concluding language of Rule 11(c) to mean the arbitrator makes an *initial* decision on arbitrability, and, later, the courts independently make the final decision. Not so. For one thing, LADT's interpretation would conflict with JAMS Rule 11(a), which provides that "[t]he resolution of the issue by the Arbitrator shall be *final*." (Italics added.) Under LADT's construction, the arbitrator's decision on arbitrability would not be entitled to deference and would have no finality. A reasonable interpretation of the Rule recognizes that arbitrability is an issue to be decided preliminarily—at the beginning of the proceeding—just as courts have frequently described the question of arbitrability as "preliminary" or "gateway." (See, e.g., *Omar v. Ralphs Grocery Co.* (2004) 118 Cal.App.4th 955, 957, 960–961 [13 Cal.Rptr.3d 562]; *In re Continental Airlines, Inc.* (3d Cir. 2007) 484 F.3d 173, 182–183; *Vidrine v. Balboa Ins. Co.* (S.D.Miss. 2009) 597 F.Supp.2d 687, 690; *A & G Coal Corp. v. Integrity Coal Sales, Inc.* (W.D.Va. 2009) 600 F.Supp.2d 709, 713; *Mapes v. Chevron USA Products Co.* (S.D.Tex. 2002) 237 F.Supp.2d 739, 743; *Ex parte Early* (Ala. 2001) 806 So.2d 1198, 1201; *Good Samaritan Coffee v. LaRue Distributing*

(2008) 275 Neb. 674 [748 N.W.2d 367, 372]; *McCandless v. McCandless Police Officers* (2006) 587 Pa. 525, 529 & fn. 6 [901 A.2d 991, 994 & fn. 6].) In other words, the arbitrator decides arbitrability issues at the outset, and his decision is final.

Nothing in *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.* (2010) 559 U.S. ___, ___–___ [176 L.Ed.2d 605, 130 S.Ct. 1758, 1773–1776] is contrary to the deference we accord the arbitrator's determination of what claims were arbitrable. In *Stolt-Nielsen*, the Supreme Court held that parties could not be compelled to submit a dispute to *class* arbitration if the arbitration clause was silent on that issue. *Stolt-Nielsen* did not address whether courts should defer to an arbitrator's interpretation and application of his or her own rules where the parties have adopted those rules and agreed that the arbitrator's decisions will be final. (See pt. IIC., *post* [discussing deference to arbitrators' decisions on procedural matters].)

B. *Remedy for LADT's Breach of Contract*

 "Judicial review of [arbitral] remedies . . . looks not to whether the arbitrator correctly *interpreted* the agreement, but to whether the award is drawn from the agreement *as the arbitrator interpreted it* or derives from some extrinsic source. . . . [W]here an arbitrator is authorized to determine remedies for contract violations, 'courts have no authority to disagree with his honest judgment in that respect. . . . [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.' " (*Advanced Micro Devices, Inc. v. Intel Corp., supra,* 9 Cal.4th at p. 378.)

"Arbitrators are not obliged to read contracts literally, and an award may not be vacated merely because the court is unable to find the relief granted was authorized by a specific term of the contract. . . . The remedy awarded, however, must bear some rational relationship to the contract and the breach. The required link may be to the contractual terms as actually interpreted by the arbitrator (if the arbitrator has made that interpretation known), to an interpretation implied in the award itself, or to a plausible theory of the contract's general subject matter, framework or intent. . . . The award must be related in a rational manner to the breach (as expressly or impliedly found by the arbitrator). . . .

"The award will be upheld so long as it was even arguably based on the contract; it may be vacated only if the reviewing court is *compelled* to infer the award was based on an extrinsic source. . . . In close cases the arbitrator's decision must stand." (*Advanced Micro Devices, Inc. v. Intel Corp., supra,* 9 Cal.4th at p. 381, citations & fn. omitted.)

"The award is rationally related to the breach if it is aimed at compensating for, or alleviating the effects of, the breach." (*Advanced Micro Devices, Inc. v. Intel Corp., supra*, 9 Cal.4th at p. 381, fn. 12.)

 "[A]rbitrators, unless expressly restricted by the agreement of the parties, enjoy the authority to fashion relief they consider just and fair under the circumstances existing at the time of arbitration, so long as the remedy may be rationally derived from the contract and the breach." (*Advanced Micro Devices, Inc. v. Intel Corp., supra*, 9 Cal.4th at p. 383.)

As pertinent here, JAMS Rule 24(c) provides: "[T]he Arbitrator shall be guided by the rules of law and equity that the Arbitrator deems to be most appropriate. The Arbitrator may grant any remedy or relief that is just and equitable and within the scope of the Parties' agreement . . . ." This type of rule "has been described as 'a broad grant of authority to fashion remedies' . . . and as giving the arbitrator 'broad scope' in choice of relief." (*Advanced Micro Devices, Inc. v. Intel Corp., supra*, 9 Cal.4th at pp. 383–384, citation omitted.) Neither the Arbitration Agreement nor the Purchase Agreement places any restriction on the arbitrator's discretion to fashion remedies.

". . . 'Arbitrators have broad discretion in fashioning a remedy for the injustice which is found to have occurred.' . . . '[A]n arbitration panel may grant equitable relief that a Court could not.' " (*Advanced Micro Devices, Inc. v. Intel Corp., supra*, 9 Cal.4th at p. 389, citation omitted.) "Equitable relief is by its nature flexible . . . ." (*Id.* at p. 390.)

LADT contends the arbitrator's finding of joint and several liability was not rationally related to the Purchase Agreement. Assuming that such "liability" is a "remedy" for purposes of *Advanced Micro Devices, Inc. v. Intel Corp., supra*, 9 Cal.4th 362, we disagree.

The arbitrator interpreted section 6 of the Purchase Agreement in deciding that LADT was jointly and severally liable for breach of that agreement. Section 6 provided: "LADT hereby consents to the terms of this Agreement, including, without limitation, the provisions of . . . Section 4. LADT shall cooperate with the parties hereto and take all actions and execute any agreements and other documents necessary to effectuate the transactions contemplated by this Agreement, including, without limitation, the transactions set forth in . . . Section 4, as necessary." Section 4 stated in part that LA ABC would indemnify the Trust for any breach of the Purchase Agreement by LA ABC. LADT signed the Purchase Agreement to acknowledge and agree to section 6.

The arbitrator relied on LADT's obligations under section 6 of the Purchase Agreement in concluding that LADT was liable for LA ABC's

failure to pay the full purchase price to the Trust. In essence, the arbitrator found that, under section 6, LADT had to assist LA ABC by indemnifying the Trust for LA ABC's breach of the Purchase Agreement.

We therefore conclude the arbitrator's finding of joint and several liability was rationally related to the Purchase Agreement. It was not derived from an extrinsic source. And because the arbitrator's award of damages consisted of the unpaid portion of the purchase price, plus interest, the remedy was rationally related to the breach.

For its part, LADT argues the arbitrator could not find it jointly and severally liable because the Trust never amended the complaint to add LADT as a defendant on the contract claim. But an amendment was not necessary. The original complaint was sufficient to put LADT on notice that it could be found liable on the contract claim. (See *Hall v. Superior Court, supra,* 18 Cal.App.4th at pp. 430, 436–437; pt. IIA., *ante*.) Further, " '[t]he essence of arbitration is its freedom from the formality of ordinary judicial procedure.' " (*Sapp v. Barenfeld* (1949) 34 Cal.2d 515, 520 [212 P.2d 233].) " '[W]hen [the parties] have adopted [arbitration], they must be content with its informalities . . . .' " (*Id.* at p. 521.) And even in court, technical pleading requirements do not apply to joint and several liability based on alter ego principles. (See *Auer v. Frank, supra,* 227 Cal.App.2d at p. 403; *First Western Bank & Trust Co. v. Bookasta, supra,* 267 Cal.App.2d at p. 915.)

In any event, the complaint alone did not define the issues to be arbitrated. The parties' submissions, including their arbitration briefs and the Hold Funds Agreement, also raised the issue of LADT's liability for breach of contract. Finally, the imposition of joint and several liability did not "amend" or "modify" the Purchase Agreement in violation of the integration clause. By interpreting section 6 of the Purchase Agreement and relying on the alter ego doctrine, the arbitrator did not remake the agreement.

## C. *Timeliness of Final Award*

JAMS Rule 24 states: "(a) The Arbitrator shall *render a Final Award or a Partial Final Award* within *thirty (30) calendar days* after the date of *the close of the Hearing* as defined in Rule 22(h) . . . . The Arbitrator shall provide the *Final Award or the Partial Final Award to JAMS* for *issuance* in accordance with this Rule. [¶] . . . [¶] (d) In addition to a Final Award or Partial Final Award, *the Arbitrator* may make other decisions, including *interim* or partial rulings, orders and *Awards*. [¶] . . . [¶] (i) After the Award has been *rendered* . . . , the Award shall be *issued* by *serving* copies on the Parties. *Service* may be made by U.S. Mail." (Italics added.)

JAMS Rule 22(h) determines the date on which the hearing is closed: "When the Arbitrator determines that all relevant and material evidence and

arguments have been presented, the Arbitrator shall declare the Hearing closed. The Arbitrator may *defer the closing of the Hearing* until a date agreed upon by the Arbitrator and the Parties, *to permit the Parties to submit post-Hearing briefs*, which may be in the form of a letter, and/or to make closing arguments. If post-Hearing briefs are to be submitted, or closing arguments are to be made, *the Hearing shall be deemed closed upon receipt by the Arbitrator of such briefs* or at the conclusion of such closing arguments." (Italics added.)

And JAMS Rule 11(a) provides that "[o]nce appointed, the Arbitrator shall resolve disputes about *the interpretation and applicability of these Rules and conduct of the Arbitration Hearing.* The resolution of the issue by the Arbitrator shall be *final.*" (Italics added.)

LADT argues the arbitrator failed to issue a timely final award under JAMS Rules. As noted, the arbitration hearing ended on March 14, 2008. The parties submitted posthearing briefs. The last brief—the Trust's reply brief—was submitted on May 16, 2008. Twenty-eight days later, on June 13, 2008, the arbitrator rendered the Interim Award. JAMS served the Interim Award by mail on June 16, 2008. The Interim Award directed the parties to submit additional briefs and declarations on specified issues and established a briefing schedule, with the Final Award due on or before August 1, 2008. Briefs were submitted. The arbitrator rendered the Final Award on August 1, 2008.

According to LADT, the arbitrator had to issue a *final* award or a *partial final* award no later than 30 days after receiving the Trust's reply brief; an *interim* award was not allowed under JAMS Rules. The Interim Award, so the argument goes, was actually a *partial final* award or a *final* award, depriving the arbitrator of authority to do anything thereafter other than award attorney fees. Thus, the August 1, 2008 Final Award, which found LADT jointly and severally liable on the contract claim, was invalid.

In analyzing LADT's argument, a court could reasonably conclude that JAMS Rules distinguish between rendering and issuing an award. The arbitrator "renders" an award on the day it is signed. JAMS "issues" an award on the day it is mailed to the parties. Here, the arbitrator rendered an award 28 days after the last brief was submitted, as allowed by JAMS Rules 22(h) and 24. To avoid exalting form over substance, that award—denominated an "Interim Award"—should be viewed as a *partial final* award: It disposed of nearly all issues and established a schedule to govern the rest of the arbitration, including the deadlines for additional briefs and the Final Award. (See Civ. Code, § 3528; *Treadwell v. Village Homes of Colo., Inc.* (Colo.Ct.App. 2009) 222 P.3d 398, 403.) JAMS Rules do not preclude

additional briefing on unresolved issues after a partial final award. Indeed, the word "partial" contemplates that more is to follow: A partial final award is "a part rather than the whole"; it is "incomplete." (Webster's 3d New Internat. Dict. (2002 ed.) p. 1646, col. 2.) Accordingly, were we to reach the merits of the timeliness issue, we might well conclude the arbitrator acted within the Rules by requiring the parties to submit additional briefs on issues that would be decided in a second—final—award. (See *Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 159–160 [35 Cal.Rptr.3d 745]; *Hightower v. Superior Court* (2001) 86 Cal.App.4th 1415, 1437–1441 & fns. 34, 35 [104 Cal.Rptr.2d 209]; *Rosenquist v. Haralambides* (1987) 192 Cal.App.3d 62, 65–66, 67 [237 Cal.Rptr. 260]; Knight et al., Cal. Practice Guide: Alternative Dispute Resolution, *supra*, ¶¶ 5:422.7 to 5:422.8, pp. 5-284 to 5-285 (rev. # 1, 2009).)

 An arbitrator's interpretation of JAMS Rules may be judicially reviewed on the merits where the parties have explicitly and unambiguously agreed that the arbitration award is subject to that scope of review. (See *Cable Connection, Inc. v. DIRECTV, Inc., supra*, 44 Cal.4th at pp. 1355, 1361, 1364–1365 & fn. 23.) But, in this case, the parties did not agree to expanded review. (See *id.* at pp. 1355, 1361; pt. IIA., *ante.*)

Because LADT's argument is based on procedural disputes concerning the conduct of the arbitration hearing and the scheduling of deadlines—the resolution of which is vested solely in the arbitrator under JAMS Rules—we defer to the arbitrator's interpretation and application of the Rules, as we now discuss.

Unlike the question of arbitrability, which is decided by the court, not the arbitrator (absent a clear and unmistakable agreement to the contrary), the parties should expect that procedural issues concerning the arbitration hearing and the scheduling of deadlines would be decided by the arbitrator as a final matter.

"Linguistically speaking, one might call any potentially dispositive . . . question a 'question of arbitrability,' for its answer will determine whether the underlying controversy will proceed to arbitration on the merits. The Court's case law, however, makes clear that . . . the phrase 'question of arbitrability' has a far more limited scope. . . . The Court has found the phrase applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the . . . matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the . . . dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

██ "Thus, a . . . dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide. . . .

"At the same time the Court has found the phrase 'question of arbitrability' *not* applicable in other kinds of general circumstance where parties would likely expect that an arbitrator would decide the . . . matter. . . . ' *"[P]roce-dural" questions* which grow out of the dispute and bear on its final disposition' are presumptively *not* for the judge, but for an arbitrator, to decide. . . . So, too, the presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability.' . . . '[I]n the absence of an agreement to the contrary . . . , issues of procedural arbitrability, *i.e.*, whether prerequisites such as *time limits*, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide.'

". . . [A] time limit rule closely resembles the . . . questions that this Court has found not to be 'questions of arbitrability.' . . .

"Moreover, the . . . arbitrators, comparatively more expert about the meaning of their own rule[s], are comparatively better able to interpret and to apply [them]. In the absence of any statement to the contrary in the arbitration agreement, it is reasonable to infer that the parties intended the agreement to reflect that understanding. . . . And for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure a fair and expeditious resolution of the underlying controversy—a goal of arbitration systems and judicial systems alike." (*Howsam v. Dean Witter Reynolds, Inc., supra*, 537 U.S. at pp. 83–85 [123 S.Ct. at pp. 592–593], citations omitted, second italics added.)

Put another way, "[i]n certain limited circumstances, courts assume that the parties intended courts, not arbitrators, to decide a particular arbitration-related matter (in the absence of 'clea[r] and unmistakabl[e]' evidence to the contrary). . . . These limited instances typically involve matters of a kind that 'contracting parties would likely have expected a court' to decide. . . . They include certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy. . . .

██ "The question here . . . does not fall into this narrow exception. It concerns neither the validity of the arbitration clause nor its applicability to the underlying dispute between the parties. . . . [T]he relevant question here is what *kind of arbitration proceeding* the parties agreed to. That question does not concern a state statute or judicial procedures . . . . It concerns contract interpretation and arbitration procedures. Arbitrators are well situated to

answer that question. Given these considerations, along with the arbitration [rules'] sweeping language concerning the scope of the questions committed to arbitration, this matter of contract interpretation should be for the arbitrator, not the courts, to decide." (*Green Tree Financial Corp. v. Bazzle* (2003) 539 U.S. 444, 452–453 [156 L.Ed.2d 414, 123 S.Ct. 2402, 2407] (plur. opn.), citations omitted.)

In a case challenging an arbitrator's authority to amend an original award, the Second Circuit Court of Appeals declined to interpret the applicable arbitration rules, instead deferring to the arbitrator's interpretation. As the court explained: "The arbitrator in this case was empowered by both parties to consider requests for revisions to be made in the arbitration award by virtue of the fact that the parties had agreed the arbitration would be conducted pursuant to the [association's rules]. Here, the arbitrator interpreted [the rules] to permit him to make some corrections to the Original Award and to bar him from making others. The arbitrator thus relied . . . upon his interpretation of the corrective authority bestowed upon him by the [rules], which the parties expressly designated as the rules governing their arbitration." (*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.* (2d Cir. 2010) 592 F.3d 329, 343, fn. omitted.)

The court continued: "[T]he [arbitration rules] themselves contemplate the arbitrator making such interpretive decisions in the first instance. [Rule 36] provides that '[t]he tribunal shall interpret and apply these Rules insofar as they relate to its powers and duties.' . . . [T]he parties' adoption of the [association's rules], including [Rule 36], in their arbitration agreements provides [an] . . . expression of their intent to allocate to the arbitrator the task of interpreting the scope of his powers and duties under [the rule permitting awards to be amended]. . . . [¶] . . . [¶]

". . . [O]nce we determine that the parties intended for the arbitration panel to decide a given issue, it follows that 'the arbitration panel did not exceed its authority in deciding that issue—irrespective of whether it decided the issue correctly.' . . . [T]he parties' arbitration agreement empowered the arbitrator to determine for himself the scope of his reconsideration authority under [the rule permitting awards to be amended]. Therefore, even assuming that we viewed the arbitrator's construction of [that rule] to be erroneous—and we reach no such conclusion here—the Amended Award cannot be vacated under [the FAA] merely on that ground." (*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc., supra,* 592 F.3d at pp. 344–346, citation omitted; accord, *Fallo v. High-Tech Institute* (8th Cir. 2009) 559 F.3d 874, 877–878.)

In addressing a dispute concerning the number of arbitrators to be appointed, the Fourth Circuit Court of Appeals stated: "We conclude that the

question of the number of arbitrators is one of arbitration procedure, and that the parties' agreement does nothing to overcome the presumption that such questions are for arbitral, rather than judicial, resolution. [¶] . . . [¶]

". . . [W]hether one arbitrator or three ought to hear the parties' dispute is not a 'question of arbitrability,' but instead a procedural one. It is not an issue that parties would have expected a court rather than an arbitrator to decide . . . because the AAA rules, which the parties contractually agreed to employ, provide specific non-judicial procedures for its resolution. . . .

"The issue instead fits squarely within the Supreme Court's jurisprudence regarding what constitutes a 'procedural' question. . . .

". . . This case . . . implicates the written rules governing the parties' arbitration proceeding. . . . [A]rbitrators are 'comparatively more expert' regarding the meanings of such rules and are 'comparatively better able to interpret and to apply' them. . . . It is . . . not only legally proper, but eminently sensible, that the dispute here is presumptively one for the arbitral forum to resolve.

". . . By presumptively remitting procedural questions to the arbitral body, the FAA necessarily recognizes [the arbitrator's] authority to answer them.

"Applying the presumption favoring arbitrability, we find that because the parties have not contractually agreed otherwise, the question of the proper number of arbitrators is for arbitral rather than judicial decision." (*Dockser v. Schwartzberg* (4th Cir. 2006) 433 F.3d 421, 425–427, citation omitted.)

In an appeal similar to the one here, the Colorado Court of Appeals observed: "The AAA rules, which were incorporated into the Arbitration Agreement, . . . provide: 'The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 days from the date of closing of the hearing . . . .' [¶] . . . [¶]

"The Arbitration Agreement also provides that the arbitrator is empowered to determine '[a]ny dispute concerning the arbitrability of any [potential] claim' and '[a]ny dispute regarding this Agreement, including but not limited to its enforceability, scope or terms . . . .' Thus, it is clear that the parties' dispute over the interpretation and application of the thirty-day provision is one that the parties contractually agreed to entrust to the arbitrator. We will enforce contractual provisions giving arbitrators such authority. . . .

"Here, the arbitrator interpreted and applied the thirty-day provision of the Arbitration Agreement . . . .

"Defendants do not contest the arbitrator's authority to decide the timeliness issue 'in the first instance,' but contend that the district court was entitled to substitute its judgment for that of the arbitrator on the timeliness issue, and that, as a matter of law, the arbitrator lost jurisdiction to conduct additional hearings thirty days after the AAA notified the parties that the hearing had been closed. We do not agree with either contention. [¶] . . . [¶]

"In this case, the [district] court's ruling went beyond determining whether a contract to arbitrate existed (a matter which was never disputed) and which claims fell within the scope of the arbitration clause (another matter which was never disputed). Rather, the court effectively disregarded the arbitrator's factual finding that the parties and the arbitrator had agreed to extend the hearing to address attorney fees and costs and the arbitrator's interpretation of the contract that by requesting post-hearing submissions relating to damages she had triggered the clause extending the time for making an award if post-hearing briefs were requested. Such determinations, however, are binding on review." (*Sopko v. Clear Channel Satellite Services* (Colo.Ct.App. 2006) 151 P.3d 663, 665–666, citation omitted; see *Svoboda v. Negey Associates, Inc.* (S.D.N.Y. 1987) 655 F.Supp. 1329, 1332 ["the AAA is empowered to interpret its own rules . . ."].)

In *Castleman v. AFC Enterprises, Inc.* (N.D.Tex. 1997) 995 F.Supp. 649, an employer participated in a JAMS arbitration and was found liable to an employee for more than $1.6 million. The employer sought judicial relief to reduce the award to $250,000. The employer relied on JAMS "Streamlined Arbitration Rules and Procedures," which govern an arbitration if the disputed claims do *not* exceed $250,000. (*Castleman*, at p. 654.) The arbitrator had previously interpreted the streamlined rules against the employer, finding that the $250,000 was not a cap or upper limit on the amount of awardable damages. The court noted that, under JAMS Rules, " 'the Arbitrator will resolve disputes about the interpretation and applicability of these Rules' " (*Castleman*, at p. 654) and deferred to the arbitrator's decision on the issue (*ibid.*).

We find the foregoing case law to be persuasive. LADT's challenge to the timeliness of the Final Award is based on an alleged violation of JAMS Rule 24. The parties agreed that JAMS Rules would govern their arbitration. The arbitrator interpreted JAMS Rule 24 as a grant of authority to render successive awards, to request additional briefs and declarations on issues not resolved in the first award, and to establish a schedule to govern the supplemental briefing and the Final Award. Under JAMS Rule 11(a), the arbitrator's interpretation and application of the Rules is final. We therefore defer to the arbitrator's decision that the Rules permitted him to render the awards in the manner and on the dates he chose.

■ We point out, however, that, by agreeing to arbitration under the auspices of JAMS, LADT did not become hostage to JAMS Rules. As stated in Rule 2: "The Parties may agree on any procedures . . . in lieu of these Rules that are consistent with the applicable law and JAMS policies . . . . The Party-agreed procedures shall be enforceable as if contained in these Rules." Rule 2 appears in the current version of JAMS Rules and has been included in every version of its Rules dating back to at least April 2003. In California, it is well settled that "the parties to an arbitration have the freedom to determine the rules by which their dispute will be resolved . . . ." (*Advanced Micro Devices, Inc. v. Intel Corp., supra*, 9 Cal.4th at p. 389.)

## D. *Disqualification of Arbitrator*

■ LADT contends the arbitrator was disqualified by reason of the civil suit filed against him to recover the arbitral fees and costs Shy incurred in the 215 Building arbitration. LADT argues that, because the arbitrator declined to recuse himself, the arbitration award must be vacated. (See §§ 1286.2, subd. (a)(6)(B), 1281.91, subd. (d), 170.1, subd. (a)(6)(A)(iii).) Under the disqualification statute, the question is whether "[a] person aware of the facts might reasonably [have] entertain[ed] a doubt that the [arbitrator] would be able to be impartial." (§ 170.1, subd. (a)(6)(A)(iii).)

JAMS Rule 11(d) states that "[d]isputes concerning the appointment of the Arbitrator shall be resolved by JAMS." JAMS Rule 1(c) provides: "The authority and duties of JAMS are prescribed in the agreement of the Parties and in these Rules, and may be carried out through such representatives as it may direct."

On December 13, 2007, JAMS National Arbitration Committee issued a written denial of LADT's request that the arbitrator be disqualified. The arbitrator separately declined the request.

■ At the outset, we must decide whether to defer to the decisions of JAMS and the arbitrator regarding disqualification. We do not write on a clean slate. In *Azteca Construction, Inc. v. ADR Consulting, Inc.* (2004) 121 Cal.App.4th 1156 [18 Cal.Rptr.3d 142], the Court of Appeal concluded that such deference was inappropriate, explaining: "[T]here is no doubt that [the arbitrator disqualification] statutes were enacted primarily for a public purpose. . . . [T]he Legislature has gone out of its way, particularly in recent years, to regulate in the area of arbitrator neutrality by revising the procedures relating to the disqualification of private arbitrators and by adding, as a penalty for noncompliance, judicial vacation of the arbitration award. . . .

"[T]here is a ' "fundamental distinction between contractual rights, which are created, defined, and subject to modification by the same private parties

participating in arbitration, and statutory rights, which are created, defined, and subject to modification only by [the Legislature] and the courts . . . ." ' . . . While the parties may be free to contract among themselves for alternative methods of dispute resolution, such contracts would be valueless without the state's blessing. Because it imbues private arbitration with legal vitality by sanctioning judicial enforcement of awards, the state retains ultimate control over the 'structural aspect[s] of the arbitration' process. . . . The critical subject of arbitrator neutrality is a structural aspect of the arbitration and falls within the Legislature's supreme authority.

"[T]he neutrality of the arbitrator is of such crucial importance that the Legislature cannot have intended that its regulation be delegable to the unfettered discretion of a private business. . . . [T]he requirement of a neutral arbitrator [is] 'essential to ensuring the integrity of the arbitration process.' . . . 'Participants who agree to binding arbitration are giving up constitutional rights to a jury trial and appeal. [Statutory] [d]uties of disclosure and disqualification are designed to ensure an arbitrator's impartiality.' . . . '[E]ven though state and federal policy favors private arbitration and the AAA is certainly a respected forum for such arbitration, [the] AAA nevertheless is a business enterprise "in competition not only with other private arbitration services but with the courts in providing . . . an attractive form of dispute settlement. It may set its standards as high or as low as it thinks its customers want." ' . . . Only by adherence to the [CAA's] prophylactic remedies can the parties have confidence that neutrality has not taken a back seat to expediency." (*Azteca Construction, Inc. v. ADR Consulting, Inc., supra*, 121 Cal.App.4th at pp. 1167–1168, citations & italics omitted.)

"[A] trial court considering a petition to confirm or vacate an arbitration award is required to determine, de novo, whether the circumstances disclose a reasonable impression of arbitrator bias, when that issue is properly raised by a party to the arbitration." (*Britz, Inc. v. Alfa-Laval Food & Dairy Co.* (1995) 34 Cal.App.4th 1085, 1102 [40 Cal.Rptr.2d 700].) Accordingly, we do not defer to JAMS or the arbitrator but examine the trial court's decision independently in assessing the arbitrator's impartiality. (See § 170.1, subd. (a)(6)(A)(iii).)

LADT maintains that the civil suit against the arbitrator reflected a good faith dispute between Shy and the arbitrator and consequently raised a doubt about the arbitrator's impartiality. LADT argues the suit was not baseless, in part because it fell within an exception to arbitral immunity, namely, the arbitrator failed to issue a timely award in the 215 Building arbitration. The timeliness issue turned primarily on whether the arbitrator had properly extended the deadline for the award under a "good cause" standard. In the

civil suit, Shy asserted the arbitrator lacked good cause. There was no dispute that an award had been issued.

■ California courts have held that arbitral immunity does not extend to an arbitrator "who *never* renders an award." (*Baar v. Tigerman* (1983) 140 Cal.App.3d 979, 983 [189 Cal.Rptr. 834, 211 Cal.Rptr. 426], italics added.) *Baar* involved a total *"failure to make an award."* (*Ibid.*, original italics.) The arbitrator "had yet to make an award some seven months after the submission [of the matter]." (*Id.* at p. 981.) The court in *Baar* commented: "To date, no case has extended arbitral immunity to cover such a situation. . . . [T]he only court to address this question denied immunity." (*Id.* at p. 983, citing *E. C. Ernst, Inc. v. Manhattan Const. Co. of Texas* (5th Cir. 1977) 551 F.2d 1026, mod. on rehg. (1977) 559 F.2d 268.) In *E. C. Ernst*, the Fifth Circuit was confronted with an arbitrator who had "consistent[ly] fail[ed] to make decisions." (*E. C. Ernst*, at p. 1034.) Together, *Baar* and *E. C. Ernst* recognize that "immunity does not apply to the arbitrator's breach of contract by failing to make any decision *at all*." (*Morgan Phillips, Inc. v. JAMS/Endispute, L.L.C.* (2006) 140 Cal.App.4th 795, 801 [44 Cal.Rptr.3d 782], italics added.) "The failure to render an arbitration award is not integral to the arbitration process; it is, rather, a breakdown of that process." (*Ibid.*) Nor may an arbitrator withdraw from an arbitration proceeding and refuse to issue an award without justification. (See *id.* at pp. 802–803.) In sum, arbitral immunity does not protect an arbitrator who unjustifiably fails to complete the job. (See *Stasz v. Schwab* (2004) 121 Cal.App.4th 420, 434–437 [17 Cal.Rptr.3d 116]; see generally 1 Domke on Commercial Arbitration (2009 supp.) § 27:1.50, pp. 102–105; 5 Witkin, Summary of Cal. Law (10th ed. 1005) Torts, § 174, pp. 297–298; *id.* (2009 supp.) § 174, pp. 44–45.)

As noted, in the 215 Building arbitration, the arbitrator issued an award. Shy sought to vacate the award as untimely *and* sued the arbitrator for failing to issue a timely award, contending the arbitrator had misinterpreted JAMS Rules concerning the granting of extensions, the types of awards that could be issued, and the scheduling of deadlines. On appeal, Division Three rejected all of those contentions (*Greenspan v. Manhattan Loft, LLC, supra,* B205917). In this appeal, we have held that a timeliness challenge to an award, if based on JAMS Rules, is unreviewable on the merits. (See pt. IIC., *ante.*) In those circumstances, the purported untimeliness does not provide grounds to vacate the award and thus does not provide a valid basis for suing the arbitrator to recover arbitral expenses. It follows that arbitral immunity barred the civil suit against the arbitrator, rendering it baseless.[4]

---

[4] The arbitration provision in the 215 Building case, like the provision here, did not permit judicial review of an arbitration award on the merits.

Further, "[t]he courts of this state cannot permit a litigant to 'shop' for [an arbitrator] through the device of filing a lawsuit against those [arbitrators] who enter rulings adverse to the litigant. Such procedure would make it possible for a litigant who obtains an unfavorable decision from [an arbitrator] to cause that [arbitrator] to become disqualified or to recuse [himself] merely by filing a lawsuit naming the [arbitrators] as defendants. Such an obvious attempt to manipulate the legal system will not be condoned." (*First Western Development Corp. v. Superior Court* (1989) 212 Cal.App.3d 860, 867 [261 Cal.Rptr. 116].)

" 'In order to guard against "[arbitrator]-shopping," "[arbitrators] have refused to disqualify themselves . . . unless there is a legitimate basis for suing the [arbitrator]." . . . "It cannot be that an automatic recusal can be obtained by the simple act of suing the [arbitrator]." ' " (*In re Murphy* (D.Me. 2009) 598 F.Supp.2d 121, 124, citations omitted.) "[An arbitrator] is not disqualified by a litigant's suit or threatened suit against him . . . or by a litigant's intemperate and scurrilous attacks . . . ." (*U.S. v. Studley* (9th Cir. 1986) 783 F.2d 934, 940, citations omitted.)

In a case involving a motion to disqualify an arbitrator, the Illinois Appellate Court recently explained: "[A]ssuming *arguendo* that [appellant] is correct in applying the appearance-of-impropriety standard, [appellant] provides no case law whatsoever addressing whether pending litigation between a party and an adjudicator mandates the adjudicator's recusal. The case law we have located is generally not favorable to [appellant's] position. Numerous courts recognize the potential for a party to manipulate the course of litigation and frustrate the orderly administration of justice by filing a suit against a judge simply to disqualify the judge. See *In re Allied-Signal Inc.*, 891 F.2d 967, 970 (1st Cir. 1989) ('[T]he disqualification decision must reflect *not only* the need to secure public confidence through proceedings that appear impartial, *but also* the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking' (emphasis in original)); *Smith v. Smith*, 115 Ariz. 299, 303 [564 P.2d 1266, 1270] (1977) ('[I]f we were to hold as a matter of law that a party can obtain a disqualification of a sitting judge merely by filing suit against him, the orderly administration of judicial proceedings would be severely hampered and thwarted'). Thus, the mere fact that such litigation is pending will not generally require recusal. [Citations.]

"The weight of authority across this nation holds that pending litigation between an adjudicator and a party is not a *per se* basis for disqualification. In *United States v. Grismore*, 564 F.2d 929, 933 (10th Cir. 1977), the Tenth Circuit Federal Court of Appeals held that '[a] judge is not disqualified

merely because a litigant sues or threatens to sue him.' Similarly, the [S]upreme [C]ourt of Ohio observed that 'the fact that a judge may be an adverse party in another case will not by itself automatically result in disqualification.' *In re Disqualification of Hunter*, 36 Ohio St.3d 607, 608 [522 N.E.2d 461] (1988). In *Untied States v. Watson*, 1 F.3d 733, 735 (8th Cir. 1993), the Eighth Circuit rejected a due process challenge where a litigant complained that there was pending litigation between the presiding judge and him. . . . [Citations.] The Delaware [S]upreme [C]ourt has also observed that '[t]he mere fact that a judge is an adverse party in another proceeding will not, by itself, result in automatic disqualification.' *Los v. Los*, 595 A.2d 381, 385 (Del. 1991)." (*Lenny Szarek, Inc. v. Workers' Comp. Com.* (2009) 396 Ill.App.3d 597 [335 Ill.Dec. 522, 919 N.E.2d 43, 51–52].)

In this case, we conclude that a reasonable person aware of the facts bearing on the disqualification issue would have viewed the arbitrator's impartiality in the same way as the trial court. In denying defendants' motion to disqualify the arbitrator, Judge Hess stated: "I have a dim view of people who try and disqualify arbitrators by suing. [¶] You are trying to create the basis for disqualification where none exists. . . . [T]he impression that I have here, is that you are trying by hook or by crook, to shortcut this, and you don't like the results, and so it doesn't matter what you try and do. [You] are pulling out all the stops [by] whatever means." In short, no reasonable person would have suspected bias on the part of the arbitrator.

In closing, we note that some attorneys and clients lament that arbitration is no longer a "quick, inexpensive, and conclusive [means of dispute] resolution." (*Moncharsh v. Heily & Blase, supra*, 3 Cal.4th at p. 11.) "[T]he arbitration experience has become increasingly similar to civil litigation, and arbitration procedures have become increasingly like the civil procedures they were designed to supplant . . . ." (Stipanowich, *Arbitration: The "New Litigation"* (2010) 2010 U.Ill. L.Rev. 1, 9.) "Once promoted as a means of avoiding the contention, cost, and expense of [a] court trial, binding arbitration is now described in similar terms—'judicialized,' formal, costly, time-consuming, and subject to hardball advocacy." (*Id.* at p. 1, italics omitted.) Yet, " '[i]f arbitration is to commit suicide, it will do so of its own choosing, because the parties have chosen to make it more expensive, time-consuming and more like litigation.' " (Seidenberg, *International Arbitration Loses Its Grip: Are U.S. lawyers to blame?* (Apr. 2010) 96 A.B.A. J. 50, 51.) "[A]rbitration is a creature of contract . . . [and] the parties [are] able to bargain for terms and provisions contained in the arbitration clause." (Comment, *Party Autonomy and Freedom of Contract in Securities Arbitration: The Dangers of Expanding Judicial Review of Arbitral Awards* (2003) 2 J. Am. Arb. 77, 96; accord, Joyce, *Returning Arbitration to an Effective Process in Construction Contracts* (May/July 2008) 63 J. Disp. Resol. 14, 18.)

Thus, if the parties want to avoid long and expensive litigation, they should draft an arbitration agreement to accomplish that goal. (See, e.g., *Cable Connection, Inc. v. DIRECTV, Inc., supra*, 44 Cal.4th at pp. 1354–1361, 1363; Stipanowich, *Arbitration: The "New Litigation," supra*, 2010 U.Ill. L.Rev. at pp. 11–17.) But if they do otherwise, they should not be heard to complain that arbitration does not provide a meaningful alternative to the judicial process.

Accordingly, we conclude the trial court properly granted the motion to confirm the arbitration award, denied the petition to vacate the award, and entered an order and judgment in favor of the Trust.

## III

## DISPOSITION

The order and judgment are affirmed.

Rothschild, J., and Johnson, J., concurred.