Filed 5/7/25  Hagopian v. Maher CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| PAUL HAGOPIAN et al., | |
| Plaintiffs and Respondents, | G062639 |
| v. | (Super. Ct. No. 30-2022-01256155) |
| KATHLEEN C. MAHER, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard Lee, Judge. Reversed.

Jeffer Mangels Butler & Mitchell, R. Scott Brink, Dan P. Sedor, Matthew D. Hinks, and Raef Cogan for Plaintiffs and Respondents.

Berman North, Scott A. Berman, and Rebecca Wildman-Tobriner for Defendant and Appellant.

\*　　　\*　　　\*

This is an appeal from an order denying a motion to compel arbitration. Defendant Kathleen C. Maher sought to enforce an arbitration agreement signed by the parties during her employment with plaintiffs. Maher contends defendants promised to pay her $1,000,000 upon the sale of the company. Instead, when the individual plaintiffs sold the company, they paid Maher a $100,000 bonus conditioned on her signing a broad release of any liability. The trial court ruled this broad release constituted a waiver of the arbitration agreement. Although the release is clearly relevant to the merits of Maher's claims, we disagree that it displaced the pre-existing arbitration agreement. Accordingly, we will reverse the order denying the motion to compel arbitration.

FACTS

Plaintiffs Paul Hagopian, Jonathan Peischl, Joshua McCasland, and Kevin Stokes (collectively, the "Splice Members") were the founding members of Splice Agency, LLC ("Splice"). Splice was founded in April of 2016. Splice was a healthcare marketing agency located in Alameda County.

Although there is some dispute in the record regarding when Maher was hired (Maher says sometime in 2016, plaintiffs alleged it was in December of 2018), it is undisputed that Maher was given the title "Managing Partner." From a legal standpoint, this is a somewhat confusing title since Splice was never a partnership, and Maher never held any ownership interest in Splice. Maher was an employee. According to Maher, her responsibilities included managing finances, handling matters relating to human resources, insurance, loans, employee benefits, and payroll.

2

In carrying out her responsibilities, Maher, on behalf of Splice, employed the services of TriNet Group, Inc. (TriNet) to handle the company's payroll and benefits. In order to receive payroll benefits through TriNet, all employees and (according to Maher) members had to sign TriNet's Terms and Conditions Agreement (TriNet Agreement). Under the TriNet Agreement, TriNet became a "co-employer" of each employee. That Agreement contained a Dispute Resolution Protocol that contained an arbitration provision.

The arbitration provision provided, "Subject to the limitations in subsection (b), this DRP [Dispute Resolution Protocol] covers any dispute arising out of or relating to your co-employment with TriNet, including your TriNet co-employer, and/or arising out of or relating to your employment with your company, as well as any dispute with an employee, officer, or director of TriNet or of a TriNet customer (all of whom, in addition to TriNet customers, are intended to be beneficiaries of this DRP)." "This DRP will survive termination of the employment relationship. **With only the exceptions described below, arbitration will replace going before a court for a judge or jury trial . . . .**" (Emphasis in original.) As relevant here, subsection (b) contained the following carve out: "**If at the time of a covered dispute there is an agreement between you and your company governing the resolution of the covered dispute, then to the extent inconsistent with this DRP, that agreement will be controlling as between you and your company (and its employees, officers, and agents).**" (Emphasis in original.)

In June 2021, the Splice Members sold their interests in Splice to a third party, a company called Fingerpaint. Around that same time, Splice paid a "transaction bonus" to all employees, conditioned on them signing a

Transaction Bonus Agreement. Maher was offered $100,000, signed the agreement, and was paid the money.[1]

The Transaction Bonus Agreement contains the following broad release of all claims: "In consideration for the Transaction Bonus, you hereby agree to give up any rights or claims you may have to any compensation, bonus, severance or other payment payable by the Company arising out of or in connection with the consummation of the Transaction. In addition, effective as of the closing of the Transaction and upon payment to you of the Transaction Bonus, you hereby unconditionally and irrevocably waive, release and forever discharge the Company and each of its . . . members . . . from any and all liabilities, obligations, damages or other losses of any kind or nature whatsoever, in each case whether absolute or contingent, liquidated or unliquidated, known or unknown, and you shall not seek to recover any amounts in connection therewith or thereunder from the Releasees." The agreement then set forth a waiver of all unknown claims under Civil Code section 1542. The agreement continued: "You understand that this is a full and final release of all claims, demands, causes of action and Adverse Consequences of any nature whatsoever, whether or not known, suspected or claimed, that could have been asserted in any legal or equitable proceeding

---

[1] There is some ambiguity in the record regarding Maher's signature. The Transaction Bonus Agreement was sent to Maher's e-mail, bears her initials, and bears a signature that appears to say K Maher. However, DocuSign populated the "Print Name" field with the name of Lauren Horton, who is apparently Maher's daughter.~**(CT 1039-1041)**~ It also populated the "amount" field with $2,000, notwithstanding that Maher was actually paid $100,000. Despite these ambiguities, the trial court found Maher had signed the agreement for $100,000~**(CT 1399)**~, and this finding is supported by substantial evidence.

against the Releasees, including, but not limited to, any matter related to your services to the Company through the date of this Agreement . . . ." Maher's signed agreement is dated June 21, 2021.

Afterward, Maher claimed that although she was never formally made a member, she participated in the transaction discussions with the Splice Members and was treated as an owner in those discussions, which included the Splice Members verbally offering her $1,000,000 as part of the transaction closing, which she agreed to. This agreement was allegedly reaffirmed repeatedly. In the end, however, the plaintiffs reneged on the deal and instead fired her from the company.

In response to Maher's claims, plaintiffs filed the present lawsuit seeking declaratory relief. They sought a judicial declaration that Maher was never an equity holder and was not entitled to any share of the proceeds of the sale of Splice.[2]

Shortly after, in May 2022, Maher filed a demand for arbitration with JAMS against the Splice Members and Splice. Maher relied on the arbitration provision found in the TriNet Agreement. Plaintiffs did not respond to the demand for arbitration or participate in any way.

---

[2] Plaintiffs also asserted causes of action for fraud, conversion, and receipt of stolen property (Penal Code section 496). This was based on Maher allegedly either destroying the Transaction Bonus Agreement she had signed, or falsely telling plaintiffs she had signed it when she had not. However, the record indicates that plaintiffs later found the agreement Maher signed (which, per footnote 1, contains her daughter's name). It is unclear to us whether plaintiffs are still pursuing the additional causes of action.

5

In the judicial action, Maher filed a motion to compel arbitration. The court denied the motion. The court first addressed the threshold issue of who decides the arbitrability of the dispute—the court or the arbitrator? As we explain in greater detail below, Maher contends that a reference to the JAMS rules of procedure in the TriNet Agreement requires that the arbitrator decide arbitrability. The court disagreed and found that the issue was for the court to decide. The court then found that the broad releases found in the Transaction Bonus Agreement superseded the arbitration provision in the TriNet Agreement. Maher appealed from the order denying the motion to compel arbitration. (See Code Civ. Proc., § 1294.)

DISCUSSION

Maher raises essentially two issues on appeal. First, she contends that the issue of arbitrability was for an arbitrator to decide, not the court. Second, she contends that, regardless of who decides arbitrability, plaintiffs should have been compelled to arbitrate.

"'There is no uniform standard of review for evaluating an order denying a motion to compel arbitration. [Citation.] If the court's order is based on a decision of fact, then we adopt a substantial evidence standard. [Citations.] Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed. [Citation.]' [Citation.] Interpreting a written document to determine whether it is an enforceable arbitration agreement is a question of law subject to de novo review when the parties do not offer conflicting extrinsic evidence regarding the document's meaning." (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 60.)

6

# I.

## ARBITRABILITY WAS FOR THE COURT TO DECIDE

Maher's first argument is that the court erred in deciding whether her claims against plaintiffs are arbitrable; she contends that was an issue for the arbitrator to decide.

As a general rule, parties can agree to arbitrate threshold issues of arbitrability. "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the . . . court to enforce, and the [Federal Arbitration Act] operates on this additional arbitration agreement just as it does on any other." (*Rent-A-Center, West, Inc. v. Jackson* (2010) 561 U.S. 63, 70.) However, the agreement must furnish "'clear and unmistakable'" evidence that the parties so intended. (*Henry Schein, Inc. v. Archer and White Sales, Inc.* (2019) 586 U.S. 63, 69; see *First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944 ["Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so."]; see also *Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1286 ["there is a presumption that they have *not* agreed to this."].) This is because "the 'who (primarily) should decide arbitrability' question . . . is rather arcane. A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers. [Citations.] And, given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would

have thought a judge, not an arbitrator, would decide." (*First Options*, at p. 945.)

Maher acknowledges, as she must, that the TriNet Agreement does not explicitly state that an arbitrator will decide issues of arbitrability. Instead, she contends the TriNet Agreement obliquely addresses arbitrability because in explaining how to initiate an arbitration, the agreement says, "Arbitration begins by bringing a claim under the applicable employment arbitration rules and procedures of the Judicial Arbitration and Mediation Services, Inc. ('JAMS') or any other dispute resolution provider agreed to by the parties, as then in effect and as modified by any superseding provisions in this [Dispute Resolution Protocol]." The JAMS Employment Arbitration Rules (JAMS Rules), Rule 11(b), provides, "Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. Unless the relevant law requires otherwise, the Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter."

We conclude the trial court was correct in ruling that issues of arbitrability were for the court to decide.

We disagree that the TriNet Agreement manifests a "clear and unmistakable" intent by the parties to enforce any particular version of the JAMS Rules. The Agreement itself does not address who resolves issues of arbitrability. The issue is supposedly addressed by the JAMS Rules, but those rules are not *required* by the contract, they are simply a default set of rules to be used if the parties were unable to agree upon another arbitration provider and its rules. The parties were free to choose a different arbitration

8

provider, in which case the JAMS Rules would not apply. And even if the JAMS Rules were to apply, the *version* of the rules that applied would be the version "as then in effect"—in other words, at the time of the signing of the contract, it was not yet determined what the rules would be at the time of the arbitration. Given these circumstances, we cannot view the mere default choice of some future version of the JAMS Rules as a "clear and unmistakable" manifestation of intent to reserve arbitrability issues for the arbitrator.

We recognize that some courts have found the incorporation of particular arbitration rules to constitute a "clear and unmistakable" manifestation of intent.

In *Greenspan v. LADT, LLC* (2010) 185 Cal.App.4th 1413, for example, the arbitrator issued an award and the appellants had opposed a petition to confirm the award. (*Id.* at p. 1435.) The parties there had submitted the matter to arbitration and, during the arbitration, agreed that the then-current JAMS Rules would apply. (*Id.* at p. 1426.) The appellant argued the arbitrator had exceeded his authority by resolving an issue that went beyond the pleadings in that case. The Court of Appeal held that was an issue for the arbitrator to decide, relying on the identical JAMS Rule that we discussed above. (*Id.* at p. 1440-1441.)

*Greenspan* is readily distinguishable from the present case because, there, the parties submitted to arbitration and the JAMS Rules. After the arbitration commenced, it was appropriate for the arbitrator to decide the scope of the arbitration. Here, by contrast, the parties have not submitted to arbitration.

In *Rodriguez v. American Technologies, Inc.* (2006) 136 Cal.App.4th 1110 the court held that by incorporating AAA rules into a contract, which specified that the "'arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, *scope* or validity of the arbitration agreement'" (*Id.* at p. 1123), the parties had clearly and unmistakably conferred exclusive authority to the arbitrator to decide issues of arbitrability. However, the issue was not analyzed in depth in that decision, which was largely focused on an unrelated issue. For the reasons stated above, we simply disagree with that broad assertion.

Instead, we are persuaded by the extensive and well-reasoned analysis in *Ajamian v. CantorCO2E, L.P.* (2012) 203 Cal.App.4th 771, 790 (*Ajamian*). There, an employee signed an arbitration provision that provided for arbitration under the National Association of Security Dealers, Inc. *or*, at one party's sole discretion, AAA or any other dispute resolution service. (*Id.* at p. 777.) The AAA rule applicable at the time stated, "'The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.'" (*Id.* at p. 788.) The court rejected the argument that this rule meant the arbitrator had *exclusive* authority to determine questions of arbitrability. After observing there was an extensive split of authority across the county on this issue, it stated, "In our view, while the incorporation of AAA rules into an agreement might be sufficient indication of the parties' intent in other contexts, we seriously question how it provides *clear* and *unmistakable* evidence that an employer and an employee intended to submit the issue of the unconscionability of the arbitration provision to the arbitrator, as opposed to the court. There are many reasons for stating that the arbitration

10

will proceed by particular rules, and doing so does not indicate that the parties' motivation was to announce who would decide threshold issues of enforceability." (*Id.* at p. 790.) However, the *Ajamian* court declined to issue a sweeping ruling on the broader question of whether incorporation of a set of rules ever satisfies that standard because two aspects of the agreement before it failed the standard: the fact that the arbitration agreement contemplated multiple potential arbitration services, and the fact that the AAA rule did not clearly state the arbitrator has *exclusive* authority to decide issues of arbitrability. (*Id.* at pp. 790-791.) As the court explained, "the rule merely states that the arbitrator shall have 'the power' to determine issues of its own jurisdiction, including the existence, scope and validity of the arbitration agreement. This tells the reader almost nothing, since a court *also* has power to decide such issues, and nothing in the AAA rules states that the AAA arbitrator, as opposed to the court, *shall* determine those threshold issues, or has *exclusive* authority to do so, particularly if litigation has already been commenced." (*Id.* at p. 790.)

We share the *Ajamian* court's broader concern about whether simply incorporating a set of rules could ever constitute a *clear and unmistakable* manifestation of intent regarding who decides issues of arbitrability. But even if it could, the same flaws present in *Ajamian* are present here, as explained above: it was not clear which arbitration rules would apply to any given conflict, and the JAMS Rules do not clearly confer *exclusive* authority to decide preliminary issues of arbitrability. Accordingly, the trial court did not err in determining the existence of any arbitration agreement.

11

## II.

### THE COURT ERRED IN DENYING ARBITRATION

Having determined that the court was acting within its authority in deciding whether a valid arbitration agreement existed, we next address its holding that the arbitration provisions in the TriNet Agreement were waived by execution of the Transaction Bonus Agreement. We conclude the court erred.

The TriNet Agreement provided that the Dispute Resolution Protocol would survive the termination of the employment relationship, but it carved out an exception as follows: "**If at the time of a covered dispute there is an agreement between you and your company governing the resolution of the covered dispute, then to the extent inconsistent with this DRP, that agreement will be controlling as between you and your company (and its employees, officers, and agents).**" (Emphasis in original.)

As the trial court correctly pointed out, "to determine whether the claims at issue are subject to the exception to arbitration, the Court must determine (1) if at the time of the covered dispute there was an agreement between Maher and Splice governing the resolution of the covered dispute, and (2) whether such agreement is inconsistent with the DRP. If the answer to both inquiries is yes, then such agreement, and not the DRP, is controlling between Maher and Splice."

The court then found that (1) was satisfied because the Transaction Bonus Agreement "broadly released all claims against Splice and the Splice Members related to Maher's services to Splice," and (2) was satisfied because "the DRP mandates that covered disputes must be arbitrated while the Transaction bonus Agreement has no arbitration

12

agreement and waived and released such claims, [and thus] the Transaction Bonus Agreement is inconsistent with the DRP."

We conclude the court erred on both counts.

On the first component of the arbitration exception—whether there is an agreement "governing the resolution of the covered dispute"—the court incorrectly interpreted this language as referring to the *merits* of the dispute. Instead, the correct interpretation is that this refers to a dispute resolution *procedure* governing the claim.

The context makes this clear. Under the TriNet Agreement, TriNet became a "co-employer" with Splice of its employees. The Dispute Resolution Protocol inured to the benefit of TriNet as well as Splice and its members. What the exception to the Dispute Resolution Protocol does is allow Splice, if it so desired, to set up a separate dispute resolution procedure that would apply between Splice and its employees—but, importantly, not between TriNet and the employees. This is clear from what comes next: "**then *to the extent inconsistent with this DRP*, that agreement will be controlling as between you and your company . . . .**" The DRP does not address the merits of any claims. It is simply a set of procedures for resolving disputes. It would not make any sense to postulate an inconsistency between the DRP and another rule "governing" a dispute unless that other rule could potentially be inconsistent with the DRP by setting forth an inconsistent procedure. Accordingly, we interpret the language "governing the resolution" of a dispute as referring to procedural rules.

This brings us to the second element of the exception to arbitration—that the alternative agreement must be *inconsistent* with the DRP. Here, the trial court's finding is on shaky ground: it reasoned that the Transaction Bonus Agreement's *silence* as to the procedure for resolving

disputes was somehow inconsistent with the DRP. We see it precisely the opposite: silence about the procedure for resolving disputes is wholly consistent with the pre-existing dispute resolution procedures remaining in place.

For the contractual exception to arbitration to trigger, *both* elements had to be satisfied: a separate agreement *governing resolution* of the claim, and an *inconsistency* between the separate agreement and the DRP. Neither condition was satisfied here. Accordingly, the arbitration provision governs the dispute.

Alternatively, Splice argues (apparently, for the first time on appeal) that the broad nature of the release in the Transaction Bonus Agreement displaces all obligations under the TriNet Agreement. In support of that argument, Splice cites *Gustafson v. State Farm Mut. Auto. Ins. Co.* (1973) 31 Cal.App.3d 361, 365 (*Gustafson*), where the court stated, "[A] valid release signed by [a party] constitutes a waiver of the right to compel arbitration." However, that case arose in the context of a policy of uninsured motorists insurance, which, pursuant to Insurance Code section 11580.2, subdivision (f), "shall provide that the determination as to whether the insured shall be legally entitled to recover damages, and if so entitled, the amount thereof, shall be made by agreement between the insured and the insurer or, in the event of disagreement, by arbitration." Under this regime, arbitration is only available if no settlement is reached, and thus it is natural that if a settlement is reached, it forfeits the right to arbitration.

However, we are not aware of any authority that a broad release of claims *per se* vitiates prior arbitration agreements where the release is silent as to the form for dispute resolution. Here, according to Maher's allegations in her demand for arbitration, she continued working with Splice

14

for two months after she signed the Transaction Bonus Agreement, presumably continuing to receive paychecks via the TriNet system. This is consistent with the nature of the Transaction Bonus Agreement. Nothing about the Transaction Bonus Agreement suggests that the parties are terminating the employment relationship moving forward. Instead, the basic gist of the agreement is that in exchange for $100,000, Maher agreed to release Splice and its Members for liability for any claims accrued to that point. Although we recognize that the Transaction Bonus Agreement released all "obligations," that term occurs in the context of a release of "all liabilities, obligations, damages or *other losses . . . .*" In context, we interpret that to refer to accrued financial claims, not a broader release of all legal obligations whatsoever. It is arguable that this agreement dooms Maher's claims on the merits (that issue was not litigated below or on appeal), but nothing about the agreement either explicitly or implicitly indicates the parties were terminating or fundamentally reconstituting their pre-existing employment rights and obligations. Accordingly, those rights and obligations remained in force, including the obligation to arbitrate, which, by the terms of the TriNet Agreement, survived the termination of the employment relationship.

Because the TriNet Agreement survived and the arbitration provision was consistent with the Transaction Bonus Agreement, the court should have enforced the arbitration provision. In not doing so, the court erred.

## DISPOSITION

The court's order denying Maher's motion to compel arbitration is reversed. Maher shall recover her costs incurred on appeal.


                                        SANCHEZ, ACTING P. J.

WE CONCUR:


MOTOIKE, J.


GOODING, J.